UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------------------X

WILLIAM J. CARMODY,

                                   Plaintiff,                      05 CV 8084 (HB)

          -against-

THE CITY OF NEW YORK; POLICE DEPARTMENT
CITY OF NEW YORK; THE CIVILIAN COMPLAINT
REVIEW BOARD; RAYMOND W. KELLY, Police
Commissioner; JOSEPH ESPOSITO; Chief, Chief of Department;
MURPHY, Lieutenant, Chief of Department; DARRYL WEIR,
Sergeant, Chief of Department; RAFAEL PINEIRO, Chief, Personnel
Bureau; ARNOLD S. WESCHLER, Director Employee Management
Division; KEVIN KENNEY, Sergeant, Employee Management Division;
CHARLES V. CAMPISI; Chief, Internal Affairs Bureau; PIGNATARO,
Captain, Internal Affairs Bureau Group 22; MATHEW GRACEN,
Lieutenant, Internal Affairs Bureau Group 22; MARLENE BEAMAN,
Lieutenant, Internal Affairs Bureau Group 22; RIVERA, Sergeant,
Internal Affairs Bureau Group 22; FLORENCE L. FINKLE,
Executive Director, Civilian Complaint Review Board; VANESSA
J. ROSEN, Investigator, Civilian Complaint Review Board;
each defendant being sued in their individual and official capacity.

                                     Defendants.

------------------------------------------------------------------------------------X

### PLAINTIFF'S RULE 56.1 STATEMENT
### IN OPPOSITION OF MOTION FOR SUMMARY JUDGMENT

      Pursuant to Rule 56.1 of the Local Rules of this Court, Plaintiff's submit that the following

facts are disputed:

Defendant's Statement #1

      Plaintiff William J. Carmody (Carmody) premises his lawsuit[1] upon claims that, during his employment, he was subjected to various "illegal and unwarranted adverse employment actions" because of his "close affiliation . . . and refusal to abandon [his] friendship" with a fellow Police Officer, Manuel Gomez (see the accompanying July 25, 2006 Declaration of lawsuit against defendant NYPD" and was involved with the Latino Officers Association (id., at ¶¶ 14-15). Plaintiff claims that he was a victim of "retaliation"

---

[1] On or about September 19, 2005, plaintiff commenced this action by filing a complaint that appears incomplete and contained many references regarding another client of plaintiff's counsel. See Profeta Dec. Exhibit 1 thereto at p.1, and at ¶¶ 51-89. Shortly thereafter, plaintiff filed the current Amended Complaint. Profeta Dec., Exhibit 2.

(id., Counts I, III, IX, XI), a "hostile work environment" (id., Counts II, IV, X, XII), and the "international infliction of emotional distress and intentional interference with employment contract" (id., Count XIII).[2]


Plaintiff's Response to Statement #1

Plaintiff William J. Carmody contends to the said abuse as a direct result of his said relationship with Officer Manuel Gomez based upon the fact that on numerous occasions between May 2003 and March 2004 said plaintiff was questioned by agents of the NYPD (i.e. Lt. Marlene Beaman, the ICO of the 43rd Pct. BXNY between May 2003 and March 2004, Sgt. Rivera IAB Group 22 (female Hispanic Sgt. first name unknown to plaintiff at present), and Lt. Mathew Gracen IAB Group 22 on February 25th 2004, and by Sgt. Barry Neiss on November 20th 2003 at approximately 7:30pm hours with all the said questioning concerning primarily if not in whole about Officer Manuel Gomez. concerning his on and off duty actions and behavior as well as his legal activity concerning Officers Gomez's EEOC Complaints, LOA Lawsuit, and other/similar legal actions and/or complaints taken against the NYPD. Supplemental to that Officer Manuel Gomez had informed "verbally" and in person both to the NYPD Office of Equal Employment to a Detective Grier and to the U.S. EEOC Senior Investigator a Mr. Jonathan Douglas in the latter part of 2003 and early part of 2004 that said plaintiff Carmody was in fact a witness to Officer Manuel Gomez's retaliation and hostile work environment within the NYPD and could and was willing to corroborate and testify to his said claims of abuse made by Officer Gomez if needed to do so. In addition plaintiff Carmody was willing to and did discuss aspects of Officer Gomez's claims against the NYPD to attorneys both prospecting to represent and in fact representing Officer Gomez in his legal claims against the NYPD. Aspects of those discussions by plaintiff Carmody were based upon what plaintiff

---

[2] Pursuant to an Amended Opinion and Order dated May 11, 2006, this Court, inter alia, granted defendants' motion to dismiss that part of the Amended Complaint that alleged various conspiracies to interfere with or deprive plaintiff of his constitutional rights (i.e., Counts V, VI, VII and VIII of the Amended Complaint).

Carmody did in fact observe while working with Officer Gomez beginning in 2003 and continuing through to his observations up until 2005 (both prior too and even after plaintiffs unjust termination on February 22nd 2005 from the NYPD) Plaintiff Carmody's cooperation in Officer Gomez's claims are indisputable and furthermore based upon the exact comments made by NYPD Sgt. Kevin Keeney on November 1st 2004  at NYPD Headquarters at One Police Plaza room 1000 and as recorded on tape by plaintiff Carmody it was clear that the NYPD was not interested in anything more than what plaintiff Carmody could offer on Officer Gomez proven by the fact that Sgt. Keeney stated  "Who was your partner on May 8th 2003" when plaintiff replied "I worked with several people" Sgt. Keeney stated "well who is it do you think I'm interested in " whereupon Plaintiff replied Manuel Gomez and Sgt, Keeney agreed. ( Pl.Ex.A)


Defendant's Statement #2
        Carmody commenced employment with the New York City Police Department ("NYPD") on or about July 1, 2002, as a probationary police officer. See Exhibit 4.[3]


Plaintiff's Response to Statement #2

Plaintiff agrees to said claim.


Defendant's Statement #3
        Upon his graduation from the Police Academy, Carmody was assigned to the 43rd Precinct of the NYPD on or about January 22, 2003. Id.


Plaintiff's Response to Statement #3

Plaintiff agrees to said claim.

---

[3] Unless otherwise noted, the Exhibits referred to herein are annexed to the Profeta Declaration.

<u>Defendant's Statement #4</u>
>       On or about March 22, 2004, Carmody was transferred to the 44[th] Precinct. <u>Id</u>.


<u>Plaintiff's Response to Statement #4</u>

<u>Plaintiff agrees to said claim.</u>

**The Numerous Civilian Complaints Filed Against Carmody,**
**And Resulting Charges And Specifications After Certain**
**<u>Allegations of Misconduct Against Carmody Were Substantiated</u>**


<u>Defendant's Statement #5:</u>
>       During his employment with the NYPD, Carmody's conduct as a New York City
Police Officer was the subject of the following complaints filed by civilians:

>   A.   In May 2003, Mr. Orlando Clarke filed a complaint with the Civilian
        Complaint Review Board ("CCRB") that, <u>inter</u> <u>alia</u>, Carmody had threatened
        his life. See Exhibit 6.
>   B.   In June 2003, Mr. David Revill filed a complaint that Carmody had
        threatened to punch Mr. Revill and his sister in the face. See Exhibit 7.
>   C.   In October 2003, Ms. Anita Eversley filed a complaint that Carmody issued a
        summons that was racially motivated. See Exhibit 8.
>   D.   In October 2003, Mr. James Carroll filed a complaint disputing a summons
        he received from Carmody and alleged that Carmody and the other officers
        at the 43rd Precinct were harassing him. See Exhibit 9.
>   E.   In November 2003, Mr. Mark Romero filed complaints regarding plaintiff's
        use of force and confiscation of Patrolman Benevolent Association cards
        during a traffic stop. See Exhibit 10.


<u>Plaintiff's Response to Statement #5</u>

Although plaintiff did receive some complaints after performing his official police functions and

duties as a New York City Police Officer the complaints in question were retaliatory in nature as a

result of plaintiff Carmody's taking police actions in the form of issuing traffic and criminal court

summonses for violations to the said alleged civilian complainers. Out of the above five "alleged

complaints" A through E only two complaints had gone to CCRB for Investigation and one

complaint going to NYPD IAB for investigation. Plaintiff was NEVER questioned EVER

concerning any remaining alleged complaints either by CCRB or NYPD IAB which only proves

that the allegations in question were either "false and/or had absolutely no merit for further investigation". It is highly suspect that three years after the alleged incident(s) and after said plaintiff Carmody had been unjustly terminated the NYPD only address these issues now and only after legal action has proceeded as a tool selectively utilized to attempt to dismiss and discredit said plaintiffs claims. In addition concerning three of the "alleged complaints" in question the NYPD had intentionally failed to give any dates, times, and locations of said complainants claims which only bring into question the motivations and reasoning behind their being brought forward now. Subject A – Mr. Orlando Clarke was issued two tickets one for no seat belt and one for no insurance which were issued on May 8th 2003 by plaintiff in the presence of two other NYPD Officers (Adam Kreitzberg and Manuel Gomez) both of whom also received CCRB complaints by Mr. Clarke. Both officers on scene testified to CCRB that plaintiff Carmody was not hostile to said complainant and did issue tickets. (Summons number 415153524-0 and 415153525-1). On March 18th 2004 Mr. Clarke was found guilty of the traffic offense of no seat belt at the Bronx Traffic Violation Bureau Court. Throughout the time period in question Mr. Clarke from May 2003 until December 2003 had refused to cooperate with CCRB Investigator Vanessa Rosen as documented by Investigator Rosen in her original CCRB Case notes on page 29-D CCRB Investigative Actions dated 8/22/2003 at 1:07pm where Investigator Rosen states "Mr. Clarke has refused to return my calls or meet with me regarding photo identification". In fact Mr. Clarke had failed to meet with Investigator Rosen at various scheduled meetings concerning the investigation numerous times. Mr. Clarke had also changed his telephone number or had it disconnected and refused to return numerous telephone calls to Investigator Rosen concerning the investigation throughout its course. In Mr. Clarke's own testimony both to the NYPD and CCRB concerning the alleged complaint it was clear he was more agitated about the tickets issued as opposed to any said alleged threats made by plaintiff Carmody

which plaintiff Carmody adamantly denies saying. Mr. Clarke's testimony concerning the time, location, and specific other facts had changed numerous times throughout the time period of the investigation and when Mr. Clarke "did actually speak to CCRB about the claim" it was again clear he was uncertain about specific facts and had positively in fact identified another unnamed NYPD Officer whom was not plaintiff Carmody with 100% certainty as being plaintiff when it clearly was not bringing into question Mr. Clarkes credibility again.  Subject B - Mr. David Rivell alleged that plaintiff Carmody had threatened to punch both him and his sister in the face. The NYPD failed to give any date, time, and location of incident and Plaintiff adamantly denies any incident ever occurred and never had any interaction with anyone named David Rivell. Subject C- In October 2003 Anita Eversly alleged that plaintiff Carmody issued a racially motivated summons to her. Plaintiff adamantly denies the racially motivated summons based upon this FACT; that on April 12th 2003 at 7:19pm hours said plaintiff Carmody was assigned to RMP Moble 2 with NYPD Sgt. Ian Brown whom is African American and a 20 year NYPD Veteran whereupon said plaintiff was assigned as Sgt.'s driver during a "No Seat Belt" summons detail ordered by a Captain Ciribisi of the 043pct. On the night in question plaintiff Carmody was ordered to conduct the motor vehicle stop for no seat belt by Sgt. Ian Brown which plaintiff did do. Plaintiff then issued complainant a summons for the said violation (summons number 414498767-0) to which on September 25th 2003 complainant Eversly was found guilty of the said violation in the Bronx Traffic Violations Bureau Court for the motor vehicle offense. If there was any race or bias in relation to the summons it was on behalf of complainant Eversly whom in traffic court called plaintiff Carmody a "white devil" and perjured herself by claiming that a Van filled with white NYPD Officers stopped her because she was Black and then proceeded to call her racially motivated names and laughed as the ticket was being issued which the traffic court judge did not believe dismissing Ms. Eversly's claims.

Considering that the incident occurred on April 12th 2003 and the complainant was found guilty on September 25th 2003 makes the allegation highly suspect for any complainant to come in months after the fact and after complainant was found guilty and fined for the said offense. Supplemental is the FACT that an African American NYPD Sgt. was on scene and conducted the motor vehicle stop with plaintiff shows there was no bias what so ever. Subject D- In October 2003 Mr. James Carroll alleged that plaintiff Carmody and numerous other NYPD officer (all unnamed) had been harassing Mr. Carroll. Plaintiff Carmody adamantly denies any interaction with a James Carroll. However, plaintiff did have an interaction with one Jamal Carroll (DOB- 7/23/79) on October 4th 2003 at the intersection of Taylor Avenue and Story Avenue (aka- 1616 Bruckner Blvd Bronx New York) within the confines of the 043Pct. At 2300 hrs. On the night in question Plaintiff Carmody was assigned to RMP 1432 as ordered by Captain Ciribisi of the 043 Pct. to patrol the area in question considering that there was a potential "gang dispute" rumored to have been brewing in the area in question after a series of stabbings and shootings. Prior to plaintiffs contact with Mr. Jamal Carroll at 2300 hrs plaintiff Carmody had assisted other assigned NYPD officers from the 043 Pct. assigned to RMP mobile 1 at 2155 hrs with a large fight of about 15 males and 1 female at the Story Avenue and Taylor Avenue location. Upon arrival Plaintiff Carmody observed one individual fighting whom plaintiff had later recognized as complainant Jamal Carroll. Upon Captain Ciribisi's orders the group was ordered to disburse and no arrests were made. Both plaintiff Carmody in one vehicle and Captain Ciribisi remained in the area on patrol concerned about another altercation escalating. At 2300 hrs plaintiff Carmody recognized Jamal Carroll wearing a black jacket, gray sweatpants, and white t-shirt carrying a knife hanging from him front right pocket as one of the individuals involved in the earlier dispute. It was clear to plaintiff Carmody that Mr. Carroll was walking quickly in a confrontational manner to a large group of males in which an altercation was eminent.

Plaintiff Carmody attempted to stop and question Mr. Carroll whom initially refused to stop and had removed from his jacket pocket a white tissue with what appeared to be marijuana and had tossed the tissue and alleged marijuana to the ground and stomped the material into the ground turning it into dust. Subject Carroll was detained by plaintiff and Captain Ciribisi and issued two summonses for Disorderly Conduct and Possession of a knife over 4 inches. With Captain Ciribisi on scene some apparent friends of complainant Carroll arrived in a vehicle and attempted to cause a confrontation with said officers whereupon one individual named Henry Jeuron was arrested for two open warrants (20015X078569 and 2001077498). Complainant Carroll stated in the presence of Captain Ciribisi that "We know how to fix you we will file a false complaint with IAB and CCRB. We will get you back". To which Captain Ciribisi told Mr. Carroll to "go right ahead the precinct is two blocks away". Subject E – Mark Romero alleged that plaintiff Carmody used force on him and confiscated PBA Cards during a traffic stop. Plaintiff Carmody confirms that he did confiscate the PBA cards as property of the PBA which their issuance and authenticity to this day are still in question and adamantly denies any use of force which was even disregarded by CCRB and NYPD IAB concerning the November 20th 2003 incident in question. This was proven by the fact that Sgt. Edward Meline was on scene during the incident as was NYPD Police Officer Andrew Forneris who confirmed that no force was used and a disorderly conduct summons was issued to Mr. Romero (summons 416011749-1). (Pl.Ex.A)

<u>Defendant's Statement #6</u>
   The number of civilian complaints filed against Carmody triggered alerts that were issued by IAB in late 2003. See Exhibit 11.


<u>Plaintiff's Response to Statement #6</u>

If these alerts in question had caused so much alarm for IAB then why was plaintiff Carmody not immediately removed from patrol, placed on modified duty status, nor been immediately terminated

for the alleged IAB concerns? Supplemental why were these "concerns" never addressed through his immediate supervisors within the 043pct. or ICO Marlene Beaman or anyone for that matter within the 043pct. and later in the 044 pct? Why were there no official departmental GO-15 hearings brought into question concerning thes IAB concerns nor was plaintiff Carmody brought down to One Police Plaza to have the concerns addressed? Simply because there were no concerns and the concerns in question only are conveniently addressed years later and after plaintiff was unjustly terminated in an attempt to discredit his legal claims against the NYPD. Contradictory to the alleged IAB concerns plaintiff Carmody had received favorable departmental performance evaluations as high as highly competent and had also received favorable letters of support and thanks from community leaders for his proactive and outstanding police performance. (Plaintiff Ex.A.)

Defendant's Statement #7

The complaint that was filed against Carmody by Mr. Orlando Clarke in May 2003 was subsequently investigated by the CCRB. See Exhibit 12

Plaintiff's Response to Statement #7

Plaintiff agrees to said claim.

Defendant's Statement #8

The CCRB is an independent and non-police mayoral agency. See Exhibit 13.

Plaintiff's Response to Statement #8

Plaintiff agrees to said claim.

Defendant's Statement #9

In or about November 2003, the CCRB substantiated the following charges that Orlando Clarke had made against, inter alia, Carmody: (a) Abuse of Authority for having stopped the car in which Mr. Clarke was an occupant; (b) Abuse of Authority for having threatened Mr. Clarke with the use of force; and (c) Abuse of Authority for having searched the car in which Mr. Clarke was an occupant. See Exhibit 14.

Plaintiff's Response to Statement #9

Plaintiff agrees that he did in fact stop Mr. Clarke and Mr. Clarke was stopped for reasons which

included Mr. Clarke intentionally running several steady red lights as well as no seat belt. Plaintiff

adamantly denies any threats made against Mr. Clarke and denies searching Mr. Clarke's vehicle

other than a visual inspection with a flashlight in the reachable and lungable area after Mr. Clarke

became confrontational and made furtive movements with comments to the affect "if you officers

were by yourselves I would make sure you were nervous"  Plaintiff conducted the motor vehicle

stop as he was trained to do at the NYPD Drivers Training / Felony Car Stop Training Program

located at Floyd Bennet Field while assigned to the PARTS Section in the NYPD Police Academy

in 2002. Plaintiff also conducted the car stop in question based upon his experience while assigned

to the area in question and based upon how he had observed other NYPD Officers assigned to the

same area conduct their motor vehicle stops. (Pl. Ex.A)

Defendant's Statement #10
       In a Memorandum dated February 2, 2004 addressed to the NYPD Commissioner,
the Executive director of the CCRB recommended that charges be brought against, inter
alia, Carmody in light of the allegations that had been filed by Mr. Clarke that were
substantiated by the CCRB. See Exhibit 14.


Plaintiff's Response to Statement #

Plaintiff cannot comment on the alleged document because plaintiff Carmody had never seen the

written communication addressed to the NYPD Commissioner by the Executive Director of CCRB.

Defendant's Statement #11
       In October 2004, the NYPD Department Advocate's Office approved Charges and
Specifications against Carmody for three counts of Abuse of Authority in connection with
his actions with respect to Mr. Orlando Clarke. See Exhibit 15.


Plaintiff's Response to Statement #11

Plaintiff agrees with said claim but also states that prior to receiving any charges and specs in October 2004 that the NYPD Department Advocates Office had made several telephone communications to the ICO and assistant ICO of the Bronx Court Section where said plaintiff was assigned on modified duty since July 2004 concerning the Orlando Clarke case in question. Plaintiff was informed by the assistant ICO at that time just prior to obtaining the charges and specs by days that the department advocates office wants to take three vacation days away from said plaintiff or suspend the said plaintiff for three days concerning the incident as opposed to an interdepartmental trial. Plaintiff informed said ICO that he wanted to in fact go to a departmental trial and wanted to present facts and evidence and face Mr. Orlando Clarke his accuser and address the false allegations. The ICO had informed the said plaintiff that the matter would go away if plaintiff "took the hit". Plaintiff Carmody informed the ICO to inform the Department Advocates Office that I demand a trial and to not contact me again unless through the PBA concerning the matter. By the NYPD Department Advocates Office offering plaintiff a three day loss and admit to wrongdoing when there was none was a NYPD practice plaintiff Carmody was not going to condone or take part in. If the case against plaintiff Carmody was as strong as the NYPD claimed it to be than why offer a three day loss as opposed to an immediate termination? (Pl.Ex.A)

Defendant's Statement #12

In June 2004, after investigating that part of the Civilian Complaint filed in November 2003 by Mark Romero that pertained to Carmody's seizure of PBA cards, the IAB substantiated a finding that Carmody had failed to follow proper procedure in failing to voucher the PBA cards that Carmody had confiscated from Mr. Romero (see Exhibit 16) and a Class A Command Discipline dated June 24, 2004 was thereafter issued to Carmody for having failed to voucher the PBA cards (see Exhibit 17).

Plaintiff's Response to Statement #12

Plaintiff readily admitted to making and administrative error based upon his lack of overall experience as a rookie police officer at the time of incident in question on November 20th 2003. In

essence the plaintiff in question was still in the "learning process of the job" and had made a common error which was also inadvertently missed by the plaintiffs immediate supervisor on scene during the incident one Sgt. Edward Meline who never informed plaintiff Carmody to voucher the PBA cards at any point during or after the incident. In addition based upon the comments made by the investigating IAB officers to plaintiff in the presence of the PBA assigned attorney representing the plaintiff in this case it was clear that there was an overall lack of supervision within the 043pct command in 2003. IAB Investigators Sgt. Rinaldi and Lt. Kelly conducting the investigation in question which took place at the 048th pct. in the Bronx, New York on June 23rd 2004 clearly understood the mistake and even joked with the plaintiff telling him he was only getting a CD and to not worry about anything it was an "honest mistake". Plaintiff accepted the CD and chose not to pursue the matter because it was considered to be "minor". Supplemental is the fact that after the incident in question in 2003 plaintiff Carmody addressed the matter with Captain Ciribisi of the 043pct to determine if his actions were appropriate to which Captain Ciribisi replied that for the most part they were and that I actually could have brought the individual Mr. Romero in for questioning and further investigation but my action were accepted. A Class A Command Discipline as per NYPD Patrol Guide Procedure 206-02 and the NYPD Police Science Student Guide under Section Command Discipline is defined as a "non-judicial punishment available to Commanding Officers/Executive Officers to maintain discipline within the command. It permits the CO/XO to correct MINOR VIOLATIONS WITHOUT RESORTING TO CHARGES AND SPECS". The incident did not warrant any further investigation or reprimand. (Pl.Ex.A)

<u>Defendant's Statement #13</u>
        The complaint that was filed against Carmody by Mr. Mark Romero ion November 2003 was also investigated by the CCRB. See Exhibit 18.


<u>Plaintiff's Response to Statement #13</u>

Plaintiff agrees with said claim.

Defendant's Statement #14

      In or about September 2004, the CCRB substantiated the following charges that Mr. Mark Romero had made against Carmody: (a) Abuse of Authority for having stopped the car which Mr. Romero was an occupant; (b) Abuse of Authority for issuing a summons to Mr. Romero; (c) Abuse of Authority for having frisked and searched Mr. Romero; (d) Abuse of Authority for having detained Mr. Romero; (e) Abuse of Authority for having searched the car in which Mr. Romero was an occupant; and (f) Discourtesy for having spoken rudely to Mr. Romero. Id.

Plaintiff's Response to Statement #14

Plaintiff agrees with the fact that CCRB substantiated Mr. Romero's claims but adamantly denies having been rude to Mr. Romero nor abusing his authority as a New York City Police Officer. In addition CCRB had unsubstantiated the use of force claim alleged by Mr. Romero concerning the November 20th 2003 incident even though Mr. Romero had provided to CCRB and NYPD IAB both video and photographic "evidence" of an "alleged assault" which clearly established that Mr. Romero's allegations and credibility were somewhat in question. (Pl.Ex.A)

**The Charges And Specifications Filed Against Carmody After**
**An Assistant District Attorney Contacted IAB About Carmody's**
**Mishandling of Evidence in Connection with a September 2003 Incident**

Defendant's Statement #15

      On or about September 20, 2003, Carmody and Police Officer Manuel Gomez were present at the scene of a public disturbance during which they made arrests, and allegations were made by certain of the arrested individuals that unidentified police officers had used excessive force. See Exhibit 19.

Plaintiff's Response to Statement #15

Plaintiff agrees that he and Officer Gomez were at the disturbance in question and arrests were made. Plaintiff adamantly denies any wrongdoing of himself or any other NYPD Officers on scene

at the September 20th 2003 incident in question. Further plaintiff states that he was never notified or

made aware or charged with any wrongdoing.

## Defendant's Statement #16

In December 2003, an Assistant District Attorney of the Bronx District Attorney's Office, James Goward, contacted IAB seeking assistance to investigate the handling of a disposable camera Officers Gomez and/or Carmody had obtained during the September 20 incident which contained pictures of the incident. Id.

## Plaintiff's Response to Statement #16

Plaintiff cannot confirm nor deny what exact actions were or were not taken concerning any IAB

investigation or the mishandling of any evidence concerning the September 20th 2003 incident in

question as allegedly reported by anyone from the Bronx DA's Office. Plaintiff was not privy to any

IAB reports or documents not any Bronx DA Reports or Documents.

## Defendant's Statement #17

Although Carmody had provided the District Attorney's Office with eight photographs that had been taken by the camera which Carmody had subsequently had developed, neither the camera nor the negatives could be found and ADA Goward sought information as to whether the camera had been vouchered. Id.

## Plaintiff's Response to Statement #17

The original negatives were offered to ADA James Goward as evidence on September 26th 2003 at

9:30am hours at the Office of the Bronx District Attorney's Office by the plaintiff in the presence of

NYPD Police Officers Manuel Gomez, Robert Kall, Felipe Fillipi, and Kristina Dietrich. Ada

Goward was not interested in any photo's, negatives, nor any camera and stated that the only reason

we were down there was because there were "allegations made against NYPD Officers" to which

Police Officer Robert Kall told ADA Goward that "we have nothing to speak about then without a

PBA attorney". (Pl.Ex.A)

Defendant's Statement #18

ADA Goward also advised IAB that there were conflicting information as to whether Gomez and/or Carmody had obtained the camera from an anonymous citizen or had confiscated the camera from one of the individuals arrested during the incident. Id.

Plaintiff's Response to Statement #18

Plaintiff cannot comment on what ADA Goward had advised to IAB about any conflicting information concerning the camera in question being that the plaintiff was not present at any conversation had between ADA Goward and IAB nor was plaintiff privy to any documents submitted or received between the Bronx DA's Office and/or IAB.

Defendant's Statement #19

After conducting an investigation, IAB determined that Carmody, who had the photographs developed at a photo shop in New Jersey, had lost the negatives and certain arrest documents. Id.

Plaintiff's Response to Statement #19

Plaintiff agrees with the said claim and the documents lost in question were copies of several  Line of Duty Injury Reports, and copies of several Aided Reports concerning injuries obtained on September 20th 2003 when plaintiff Carmody and Officer Manuel Gomez were attacked by known Narcotics Dealers whom attempted to take their forearms and assault and/or kill them with their own weapons. The information in question was voluntarily provided to the NYPD IAB Supervisor a Captain Pignataro in January 2004 via several telephone communications with the Captain and plaintiff as well as was voluntarily provided to IAB Investigators from Group 22 in February 2004 at an official GO-15 Hearing at the 048th pct. between the plaintiff Carmody and Lt. Mathew Gracen and Sgt. Rivera (female Hispanic Sgt. first name unknown). Had the plaintiff anything to hide or thought his action were in error or question plaintiff could have denied any claims or declined to comment on the issues at hand. Yet the plaintiff was forthright in his statements to IAB. (Pl. Ex.A).

Defendant's Statement #20
    The negatives were considered as evidence for the criminal case then being prosecuted by the Bronx District Attorney's Office arising from the September 20, 2003 incident. Id.


Plaintiff's Response to Statement #20

Plaintiff offered the negatives as evidence on September 26th 2003  to which ADA James Goward

was not interested in the plaintiff's evidence and the plaintiff was told to "hold onto them" that he

"may need them for court" not only by ADA Goward but by NYPD Sgt. Brendan Nolan of the

043pct. in September 2003. (Pl.Ex.A)

Defendant's Statement #21
    The negatives had not been vouchered. Id.


Plaintiff's Response to Statement #21

Plaintiff agrees with the said claim the negatives were not vouchered because they were

inadvertently lost as was other arrest documents pertaining to the case which addressed the injured

plaintiff and police Officer Manuel Gomez concerning the September 20th  2003 incident. Plaintiff

again adamantly denies he was informed to voucher any negatives and only told to hold onto them

by his superior and the Bronx DA's Office. Had the plaintiff been told to voucher them he would

have done so immediately. (Pl.Ex.A)

Defendant's Statement #22

    In connection with its investigation, IAB inter alia, (a) substantiated a finding that Carmody had failed to safeguard evidence and failed to prepare a proper property clerk invoice; and (b) noted that Carmody, Gomez, and a third officer had violated departmental procedure regarding "omitted activity log entries" by failing to document certain information in their activity logs. Id.


Plaintiff's Response to Statement #22

Plaintiff adamantly denies making any improper memo book entries and in fact made several pages

of detailed memo book entries concerning the September 20th Incident in question. Plaintiff did in fact safeguard the evidence as he was ordered to do so to his understanding and to the best of his ability. An improper memo log entry is a minor disciplinary matter which the NYPD selectively utilize in order to find "some if any" fauly with an officers actions whereupon no other serious faults or violations can be found. For example, a police officer can be written up for improper memo log entries hi they fail to dot an "I" or cross a "T" is you get technical. (Pl.Ex.A)

<u>Defendant's Statement #23</u>

On or about April 28, 2004, Schedule A Command Disciplines were issued to Carmody, Gomez and the third officer for Omitted Activity Log entries; the Command Disciplines issued to Carmody and Gomez also referenced their failure to invoice the disposable camera that was obtained during the September 2003 incident. See Exhibit 20.

<u>Plaintiff's Response to Statement #23</u>

Plaintiff denies any knowledge of the alleged issued command disciplines and had never signed off on any said disciplines nor does plaintiff recall the issue ever being addressed to him by anyone from the NYPD. All forms of Charges and Speculations and Command Disciplines require that the officer being charged complete and sign notification of the charge. The Command Discipline form is a two sided-documents, the second side provides a section to be completed and signed by the officer being charged. Defendants have failed to provide <u>any</u> signed notifications or the signed and completed Command Discipline second page by plaintiff. (Pl.Ex.A, Ex.C)

<u>Defendant's Statement #24</u>

On or about June 14, 2004 a schedule A Command Discipline was issued regarding Carmody's failure to safeguard evidence by reason of his having lost the negatives. See Exhibit 21.

<u>Plaintiff's Response to Statement #24</u>

Plaintiff denies any knowledge of the alleged issued command disciplines and had never signed off

on any said disciplines nor dose plaintiff recall the issue ever being addressed to him by anyone

from the NYPD. All forms of Charges and Speculations and Command Disciplines require that the

officer being charged complete and sign notification of the charge. The Command Discipline  form

is a two sided-documents, the second side provides a section to be completed and signed by the

officer being charged. Defendants have failed to provide <u>any</u> signed notifications or the signed and

completed Command Discipline second page by plaintiff. (Pl.Ex.A Ex.C)


<u>Defendant's Statement #25</u>
     On or about October 8, 2004, the NYPD Advocate's Office approved two counts of
Charges and Specifications against Carmody arising from Carmody's failure to properly
invoice property received in connection with the September 2003 incident. See Exhibit 22.


<u>Plaintiff's Response to Statement #25</u>

Plaintiff denies any knowledge of the alleged charges and specs issued and had never signed off on

any said disciplines or dose plaintiff recall the issue ever being addressed to him by anyone from the

NYPD or Department Advocates Officer.  The only Charges and Specs the plaintiff is aware of and

signed off on as receiving was on October 21st 2004 in Room 402 at 9:15am hours at One Police

Plaza with PBA Attorney Michael Martinez present. Those charges in question were only addressed

concerning the May 8th 2003 Mr. Orlando Clarke incident and nothing else. All forms of Charges

and Speculations and Command Disciplines require that the officer being charged complete and

sign notification of the charge. The Command Discipline  form is a two sided-documents, the

second side provides a section to be completed and signed by the officer being charged. Defendants

have failed to provide <u>any</u> signed notifications or the signed and completed Command Discipline

second page by plaintiff. (Pl.Ex.A, Ex.C)

**The Charges And Specifications Filed Against Carmody And
Placement On Modified Duty After Allegations Were Received
And Investigated That Carmody Had, In Effect,
Engaged In Residency Fraud And Was Not In Compliance With
Residency Requirements**

Defendant's Statement #26

     In mid-November 2003, and IAB Command Center received a call from the parents of a former girlfriend of Carmody's and was informed that Carmody was residing in a house he owned in Hoboken, New Jersey (rather than at a Bronx, New York address at which Carmody had purported to reside with a fellow police officer). See Exhibit 23.

Plaintiff's Response to Statement #26

Plaintiff was completely aware of Ms. Burke's actions concerning her harassment of him and his family for months after their dating relationship ended in May of 2003 whereupon Ms. Burke and her family had tried to communicate with the plaintiff through third party contacts to which the plaintiff fearing for his safety and that of his family from the "abnormal and frightening behavior" of Ms. Burke refused to accept any such contact. Highly in question to the "residency allegations" was the fact that Ms. Burke had given a false address to NYPD Investigators with that address being 157 3rd Street Hoboken, New Jersey when in fact she was not and had not been residing there since June of 2003. In addition Ms. Burke nor the Burke family had absolutely no idea where the plaintiff had resided especially in the Bronx considering there was no communication of any kind between any said parties. (Pl.Ex.A)

Defendant's Statement #27

     In the course of investigating this allegation, the NYPD Patrol Services Bureau placed Carmody under surveillance at both the Hoboken and Bronx address during which (a) Carmody was never observed entering or leaving the Bronx address, and (b) Carmody was observed on thirteen occasions at the Hoboken address. Id.

Plaintiff's Response to Statement #27

Plaintiff clearly states that the investigative work done by the Patrol Services Bureau especially by Sgt. Daryl Weir and Sgt. Andrew Nelson was clearly "shoddy" and in error. Plaintiff Carmody knew he was being followed and watched because he personally observed the Investigators in question between December 2003 and June 2004 on various occasions both in New Jersey and New York City. The investigators in question; in particular Sgt. Daryl Weir had both photographed and video taped the plaintiff in his travels. Sgt. Weir had attempted to mislead the facts of the investigation and evidence in his testimony to the New York State Department of Labor in Administrative Law Hearings between May 2005 and December 2005 before the Honorable Judge Beverly Diego where it was discovered that plaintiff Carmody was only observed in New Jersey on his regular days off, weekends, and vacation days with one day including a family funeral over a six month period and only observed at his property whereupon the plaintiff was working on the property in question which was in construction disarray. The NYPD failed to provide any dates concerning their "observations" of the Bronx address and by not "observing" or "allegedly not observing" the plaintiff at the Bronx address does not prove he is not a resident there. It only proves that at the alleged times the NYPD had claimed to have observed the location in question the plaintiff did not go there or may have arrived or left either before or after the said investigators arrived. The plaintiff would have been more than happy to voluntarily let in anyone from the NYPD at he time period of the investigation either into his Bronx Apartment or the property in question the plaintiff was working on in New Jersey in order to prove his residency and disprove any false allegations made against him by Ms. Burke or the Burke family. Had Sgt. Weir or Sgt Nelson entered either property in question there would have been little to no doubt where the plaintiff resided which was in New York City. (Pl.Ex.A,Ex.D. Ex.E, Ex.F)

Defendant's Statement #28
The NYPD Patrol Services Bureau also canvassed persons employed and/or

residents of both the Bronx address and a prior Manhattan address that Carmody had purportedly used, and except for a doorman at the prior Manhattan address who said that Carmody may have visited the Manhattan apartment, none of the persons interviewed recognized Carmody. Id.

Plaintiff's Response to Statement #28

Plaintiff responds that just because the NYPD go into a store within the same geographical area of residence or speak with an area resident that does not recognize the plaintiff that is absolute proof of nothing. The plaintiff in question is a very quite and low key individual that does not socialize with neighbors nor frequent any specific businesses as often as the NYPD would like the court to believe. The plaintiff had an unusual work schedule from 6pm at night to 2:35 am hours, with various overtime, and changing schedule for police details and/or court. The plaintiff is a Caucasian male of average height and weight with no distinguishing scars or marks other than tattoo's on both arms which the plaintiff did not display off duty because of fear that someone would recognize the tattoo's in question while he wore short sleeves at work thus, identifying him as a police officer while off duty and placing him at risk. Especially considering the fact that the plaintiff was working in one of if not the most dangerous police precincts in the City of New York. Plaintiff contends that he always blended in all his life and often wears sunglasses and baseball hats even to this day. Plaintiff also contend that he would not recognize any of his neighbors if he passed them on the street because he does not have and real reason to interact with anyone other than immediate friends and family. Defendants have failed to provide specifics about these alleged interviews thereby denying plaintiff the opportunity to verify the statements contained therein. (Pl.Ex.A)

Defendant's Statement #29

When the police officer who supposedly resided with Carmody at the Bronx address was interviewed, the officer testified that, inter alia, Carmody would pay him $200 per month to say in the one bedroom Bronx apartment, but only stayed there

approximately twice a month at which time Carmody would sleep on a couch. Id.

Plaintiff's Response to Statement #29

Plaintiff agrees that he did pay rent and reside at the said location in the Bronx. However, due to both officers completely different social lives and plaintiffs responsibilities concerning an ill family member and the aggressive work he was doing on his property there were in fact  times when the plaintiff was at the Bronx apartment when the roommate in question was not. Yet the NYPD does not provide any specific dates or timeframes. (Pl.Ex.A)

Defendant's Statement #30
When Carmody was interviewed, he (a) could not recall where the laundry room was or the number of floors at the prior Manhattan address where he purported lived from May 2001 to July 2003; (b) testified that he stayed at the Bronx apartment seven to ten days a month and would spend the balance of the nights with either his sister who lives in Hoboken, at the house he owned in Hoboken, or with various women none of whose names he could recall (except for one girl, "Wendy," with whom he spent one night). Id.

Plaintiff's Response to Statement #30

Plaintiff never stated that he could not recall where the laundry room was in question he said he did not know because he never used the laundry room and never went into the laundry room. Plaintiff also claims that he could not recall the exact amount of floors in a multilevel high-rise apartment building because he never had reason to know the exact amount of floor in the building. Plaintiff did testify that he did stay in the Bronx apartment often and never testified to the fact that he stayed with his sister in the house or property he owned in New Jersey because not only was the property non-inhabitable but also because his sister did not reside at the family owned property and had not for several years being married with two young children. (Pl.Ex.A)

Defendant's Statement #31
In light of the conflict of testimony regarding the number of nights Carmody spent at

the Bronx apartment, the officer who supposedly lived with Carmody was again questioned and reiterated that Carmody stayed at the Bronx apartment on average only 2-3 times per month. Id.

Plaintiff's Response to Statement #31

Plaintiff contends there was no "conflict" concerning any timeframe of when the plaintiff stayed in the Bronx either between himself or the other officer in question Adam Krietzberg. (Pl.Ex.A)

Defendant's Statement #32

In a July 9, 2004 Memorandum regarding the investigation of the allegations regarding Carmody's failure to comply with residency requirements, the Commanding Officer, Investigation and Evaluation Section concluded that:

> Based on the observations conducted of Police Officer Carmody, the witness statements, and Officer Carmody's own admissions regarding the amount of time he stayed at the New York address, as well as the location of the majority of Officer Carmody's possessions[, it] is the determination . . . that officer Carmody does not meet the criteria set forth . . . regarding residency. Therefore, it is recommended that the allegation that Police Officer Carmody lived in Hoboken, New Jersey while employed by the New York City Police Department be closed, **Substantiated.** Further more, it has been determined that there is other misconduct noted, in that Police Officer Carmody made **False and Misleading Statements** while being interviewed . . .

Id. (Emphasis in original)

Plaintiff's Response to Statement #32

Plaintiff contends that he was a New York City Resident prior too, during, and after his employment with the NYPD and adamantly NEVER made any false and misleading statements. Plaintiff submitted numerous documentary evidence.  The Unemployment Insurance Board of the State of New York on appeal determined that defendants' evidence at to misconduct concerning residency was not credible and that plaintiff did not commit residency fraud. (Pl.Ex.A, Ex.D, Ex.G)

Defendant's Statement #33

Carmody was thereafter placed on Modified Duty on or about July 19, 2004 in connection with the investigation regarding his failure to comply with residency requirements. See Exhibit 24.

Plaintiff's Response to Statement #33

Plaintiff does not agree with these allegation being that when the plaintiff was placed on modified assignment Lt. Murphy (first name unknown) and Sgt. Andrew Nelson from the Chief of Departments Office whom placed the plaintiff on modified assignment informed the plaintiff when asked why he was placed on modified assignment the superior officers replied; "We don't know what we are going to do with you yet". Which plaintiff replied "Am I going to get fired, if so do it now so I can get another job". The superior officers refused further comment and left the 044pct. No reason was ever given to the plaintiff ever as to why he was placed on modified assignment. (Pl. Ex.A)

Defendant's Statement #34

When Carmody was placed on modified duty, he was still on probation because, as of July 19, 2004, he had been out sick on or about 13 days (see Exhibit 4 at p.2) and had taken on or about 36 days of annual leave (see Exhibit 36).

Plaintiff's Response to Statement #34

Plaintiff claims that there is a possibility that he may or may not have been on probation and that the question of probation concerning vacation and/or sick days is in question and selectively implemented throughout the NYPD. Plaintiff also contends that he was paid for the vacation which was authorized by the NYPD and his sick days included days where he was injured in the Line of Duty on some occasions while performing police duties. Regardless plaintiff was still a full duty NYPD police officer and was entitled to sick days and vacation which cannot and should not be held against him. (Pl. Ex.A)

Defendant's Statement #35

Just over a month before Carmody was placed on Modified Duty, Carmody had filed a Voluntary Petition in the United States Bankruptcy Court for the Southern District of New York in which he (a) listed the house he owned in Hoboken, New Jersey as his "home" (see Exhibit 25, schedule A"); (b) listed his "home: in Hoboken in connection with seeking the "homestead exemption" under § 5206(a) of the New York CPLR (id., "Schedule C"); and (c) indemnified a creditor as holding a "First Lien on Residence home" on the Hoboken house (id., "Schedule D").[44]

Plaintiff's Response to Statement #35

Plaintiff contends that he did file for Chapter 13 Bankruptcy which is his Constitutional Right to do so and had done so through an attorney in New York City being he was a resident of New York City and was not able to file in New Jersey regardless of whether or not the property in question the plaintiff owned is in New Jersey. Had there been any question about the plaintiff's residency in New York the plaintiff would have had to file the Chapter 13 Bankruptcy in Newark New Jersey which the plaintiff did not do because he was not permitted to do. The Bankruptcy in question was granted and approved without any incident. Regarding the motion filed by Attorney Dan Shaked for one creditor dated August 23rd 2004 Attorney Shaked stated "Upon information and belief, the Debtor's primary residence is located at 207 8[th] Street, Hoboken, NJ. The Debtor does not reside at 501 West 189[th] Street, New York, NY, but rather uses that address to meet the NYC Police Department's requirement that its employees be…" As the NYPD state this is "interestingly" in question being that no such information was ever stated in any Bankruptcy Documents ever concerning the plaintiffs situation and no mention was ever made especially to the Bankruptcy

---

[4] Interestingly, in filing August 2004 Objections to Carmody's proposed Bankruptcy Plan, the attorney for the Secured Creditors averred that:

> Upon information and belief, the Debtor's primary residence is located at 207 8[th] Street, Hoboken, NJ. The Debtor does not reside at 501 West 189[th] Street, New York, NY, **but rather uses that address to meet the NYC Police Department's requirement that its employees be residents of the City of New York.**

See Exhibit 26, at ¶ 4(b) (emphasis added).

Court about an ongoing NYPD Internal Investigation especially as it pertained to any residency claims. How conveniently it is that Mr. Shaked has privy to a "confidential NYPD internal affairs investigation" and makes mention to claims which the plaintiff finds shocking and was only made aware of in June 2006 while being deposed by the City of New York Corporation Council. Plaintiff overtly states that the issued raised by Attorney Shaked concerning residency was never addressed in Federal Court and it was clear that Attorney Shaked's allegations in his failed motion were denied. How and where did attorney Shaked obtain this information when members of the plaintiffs own family did not know what was going on with the situation in question in its entirety? It is clear that Attorney Shaked released confidential police information where he obviously obtained from someone inside the NYPD either through the IAB Unit or One Police Plaza? These facts alone establish the draconian and retaliatory nature of the NYPD who had clearly made an attempt to have the plaintiff ruined financially and lose his family own property. (Pl.Ex.A, Def. Ex.25)

Defendant's Statement #36
     Carmody testified at deposition that he had been a resident of New York City since 2001. See Exhibit 5, p.258.


Plaintiff's Response to Statement #36

Plaintiff agrees to said claim.


Defendant's Statement #37
     During discovery, Carmody produced a March 15, 2003 letter from his tax return preparer which indicated that, for tax year 2002, Carmody filed a New Jersey Income Tax Resident Return. See Exhibit 27.


Plaintiff's Response to Statement #37

Plaintiff adamantly denies he filed a 2002 resident of New Jersey Tax Return when in fact he

resided in New York in 2002 and filed in New York his tax return. Plaintiff alleged that he did close

out his pension in New Jersey and did file property taxes in New Jersey for his property and did

have to pay taxes on his pension and employment wages while he worked in New Jersey in 2001

and in part 2002. Plaintiff is not a tax expert and had hired a tax expert to file his paperwork for him

to which he signed and paid whatever taxes he was required to pay both in New York and New

Jersey as well as on the Federal Level. (Pl.Ex.A)

Defendant's Statement #38
        On or about October 6, 2004, the NYPD Advocate's Office approved Charges and
Specifications against Carmody for one count of failing to comply with residency
requirements. See Exhibit 28.


Plaintiff's Response to Statement #38

Plaintiff has no knowledge of any charges or specs nor has plaintiff ever signed or accepted any said

charges. (Pl.Ex.A)

Defendant's Statement #39
        On or about November 22, 2004, the NYPD Advocate's Office filed a Notice of
Amendment of Charges to add a further specification against Carmody for having made
false statements when he was questioned about the number of times he had raised at the
Bronx apartment he was allegedly sharing with another police officer. See Exhibit 29.


Plaintiff's Response to Statement #39

Plaintiff adamantly denies any false statement ever to anyone especially the NYPD in any official

and non-official capacity. Plaintiff contends that he spoke the truth which the was clear to him the

NYPD did not want to hear and said plaintiff was denied any and all opportunities to confront

witnesses or complainants, obtain and review documents, or listen to or obtain any taped interviews

or interrogations between anyone from the NYPD or CCRB. Plaintiff only obtained some

documentary evidence just prior too his unjust termination in early 2005 and some "highly edited"

documentation after plaintiff had filed a FOIL Request with the CCRB in mid 2005. (Pl.Ex.A)

**The February 22, 2005 Termination of Carmody's**
**Employment As a Probationary Officer of the NYPD**

Defendant's Statement #40

By December 2004, Carmody had been the subject of numerous civilian complaints (see Exhibits 6-10), and was the subject of three different sets of disciplinary charges arising from (a) the substantiation of a civilian complaint that Carmody had abused his authority and wrongfully threatened the use of force (see Exhibit 15); (b) Carmody's improper handling of evidence that the Bronx District Attorney's Office had sought in connection with a criminal case (see Exhibit 22); and (c) Carmody's failure to comply with NYPD residency requirements (see Exhibit 28) – which charge was amended in November 2004 to include a furtherer specification for making a false statement or misrepresentation during the IAB's investigation of Carmody's residence (see Exhibit 29).

Plaintiff's Response to Statement #40

Plaintiff only obtained one set of charges and specs concerning the May 8th 2003 CCRB Mr.

Orlando Clarke incident. Plaintiff contends that the complainants in question are non-credible, that

he was never informed of said complaints, never signed off on them, nor was he permitted the

opportunity to address any said allegation other than through the New York State Department of

Labor in 2005 to which plaintiff Carmody was completely exonerated in an Administrative Law

Hearing and on State Board of Appeal of any wrongdoing or misconduct especially as it pertained

to residency. Sergeant Wier NYPD investigator first testified at the UIB hearing that plaintiff was

observed in New Jersey 13 times out of 22 times he was under surveillance, however he could

provide only eight documented dates of surveillance, of the eight days plaintiff presented irrefutable

evidence that seven of the eight days he was observed he was on vacation or it was his scheduled

day off. At no point could Sgt. Wier provide evidence that plaintiff was actually residing in New

Jersey.

Plaintiff adamantly denies again any wrongdoing, abuse of authority, misconduct, threats of

force, and mishandling of evidence. Plaintiff contends that if the evidence in question was so

mishandled and highly controversial then why did the Bronx District Attorney's Office including

ADA James Goward and ADA Chris Clarke use the said "mishandled evidence" as key and vital

evidence to prosecute the five said defendants in the September 20th 2003  incident in question. That

in turn is saying that the City of New York, the NYPD, and the Bronx DA's Office had known

about alleged mishandled evidence, condoned it, and prosecuted with in anyway.  Those said

actions then are clearly grounds for appeal on behalf of the arrest and charges as well as grounds for

a Federal Civil suit by the said defendants against the NYPD, City of New York, and the Bronx

DA's Office. Four of the five individuals Carlos Silverio, Enrique Rincon, Caesar Mendez, and

Ricardo Felix   plead GUILTY to the said charges in 2004 and 2005 and defendant Joseph Roman

was found GUILTY by a Bronx Jury of his peers for the crimes on September 20th 2003. It is clear

that the evidence in question was not as mishandled as alleged otherwise that said evidence would

have been tossed out of court and the defendants not charged. (Pl.Ex.A,Ex.D, Ex.E, Ex.F)

Defendant's Statement #41
         On or about December 1, 2004, members of the Employee Management Division
Probationary Monitoring Committee unanimously voted to recommend the termination of
Carmody's employment. See Exhibit 30.


Plaintiff's Response to Statement #41

Plaintiff cannot confirm or deny any said claims being plaintiff was not privy to any said

information or documents nor was plaintiff at said meeting.

Defendant's Statement #42
         In a Memorandum from the Chief of Personal to the First Deputy Commissioner, it
was recommended that:
                   Probationary Police Officer William Carmody be
                   terminated [because] [f]or his short tenure as a New
                   York City Police Officer, Probationary Police Officer
                   Carmody has accumulated an exorbitant amount of
                   complaints resulting in substantial disciplinary actions
                   being taken against him [and] failed to maintain a
                   residence in New York City or its surrounding counties

as  required by Department Regulations.
See Exhibit 31 at ¶10.

Plaintiff's Response to Statement #42

Plaintiff contends that he was a New York City resident and was already exonerated of any said

residency and misconduct claims through the New York State Department of Labor in 2005.

Plaintiff also contends that he was employed and stationed in an area where civilian complaints

were commonplace to NYPD Officers with the 043pct in 2003 with the precinct in question one of

the highest offending precincts for CCRB complaints citywide as reported by CCRB in their annual

Attribution of Complaints Report. In addition upon arrival at the 043pct. plaintiff Carmody was

informed at roll cal by Deputy Inspector Edward Mullane that the 043pct lead the borough of the

Bronx in CCRB complaints. Plaintiff also contends that numerous other NYPD officers had

received an equal to if not more serious and substantial complaints and allegations and no action

was taken against any of those said officers. Plaintiff was consistently denied the opportunity to

address and confront any said complainants or provide evidence to the NYPD which would have

exonerated him from any wrongdoing and was consistently told to accept the punishment and move

on without a trial to which the plaintiff said he was not going to either condone or accept. Plaintiff

was not going to admit guilt or wrongdoing to allegation when there were none. (Pl.Ex.1,Ex.4, Ex.5,

Ex.6)

Defendant's Statement #43

By letter dated February 22, 2005, Carmody was notified that his services as a
Probationary Police Officer in the NYPD were terminated. See Exhibit 32.

Plaintiff's Response to Statement #43

Plaintiff agrees with said claim but contests the fact that he not on probation at the time of his unjust

termination.

Defendant's Statement #44

When questioned at deposition about factual basis for his claims of retaliation, Carmody initially testified as follows:

> Q. …you believe that you were retaliated against because you became friends with Officer Gomez?
> A. …Yes
> Q. And what do you base that on?
> A. Because I was fired and retailed against by the New York City Police Department after I became friends with Officer Gomez.
> Q. Is there any other reason [why] you think you were retaliated against by the police department?
> A. No
> Q. Do the basis of your retaliation lawsuit is that you were friends with Officer Gomez and the police department retaliated against you because you were friends with Officer of Gomez?
> A. Yes

See Exhibit 5 at pp. 73-74

Plaintiff's Response to Statement #44

Plaintiff agrees with the deposition testimony and believes that he was retaliated and eventually terminated because of his friendship and support of Officer Manuel Gomez. Plaintiff contends that once it was clear to the NYPD that he was not only going to stand up for Officer Gomez, but himself as well the retaliation against him only became worse whereupon the plaintiff police actions and duties were brought into question and scrutinized with the NYPD looking for anything and everything to use in order to cause harm to said plaintiff some physically, emotionally, and psychologically as well as the plaintiffs career and reputation.

On or about May 2003 through August 2003 Lt. Beaman questioned plaintiff numerous times about Officer Gomez. She asked him questions about the allegations in Gomez' LOA case and his discrimination complaints against the Department. Lt. Beaman told plaintiff that Gomez was

a problem and that they got cases and complaints coming up and she wanted to know if he could provide the department with information about him.  She also wanted plaintiff to inform her of any illegal actions by Gomez and to inform her about all activities. Starting about September 2003 until plaintiff was transferred out of the precinct in March 2004 he was questioned almost daily by Lt.Beaman  about Officer Gomez , his complaints and lawsuits, and his activities. She wanted to know what Officer Gomez was doing to document his allegations. Every time Lt. Beaman would questioned plaintiff she made written notes.  Lt. Beaman never questioned plaintiff about any other officer than Officer Gomez. Plaintiff does not  believe she questioned any other officer about Officer Gomez . Plaintiff always responded that there was nothing negative to say about Gomez, he was an excellent officer. Plaintiff told Lt. Beaman that he supported Gomez in his claims against the NYPD.  Plaintiff clearly indicated his support of Gomez but not cooperating with Lt. Beaman in providing non-extent negative and illegal activities. Lt. Beaman has testified that she may have interviewed plaintiff once and may have taken notes but did provide them. (Pl.Ex.A, Ex.G)

Defendant's Statement #45
       When Carmody was asked to explain why it was that other officers who had befriended Officer Gomez were not the victims of retaliation and yet Carmody allegedly was, Carmody testified that he was retaliated against because of Officer Gomez had listed Carmody as a witness in the complaint he filed with the NYPD Office of Equal Employment Opportunity in or about late 2003-early 2004. See id., at pp. 74-76.

Plaintiff's Response to Statement # 45

Plaintiff contends that Officer Gomez did in fact verbally inform the NYPD Office of Equal Employment that plaintiff was a witness to Officer Gomez's abuse and retaliation and this was informed to one Detective Grier (a female NYPD Detective) to which Officer Gomez has audio recorded verifying plaintiff's claims. (Pl.Ex.A)

<u>Defendant's Statement #46</u>

The only mention Gomez made of Carmody  when he asserted a claims of discrimination, unfair treatment and retaliation with the NYPD Office of Equal Employment Opportunity in early 2004 was that Carmody and certain other white officers received more favorable treatment from the then Commanding Officer of 43rd Precinct. See Exhibit 33 at p.; Exhibit 34 at p.2.

<u>Plaintiff's Response to Statement #46</u>

Plaintiff disagrees with this claim being that the plaintiff had little to almost zero communication with the Commanding Officer of the 043pct and the only detailed communication plaintiff had with the CO of the 043pct was on three separate occasions. In 2003 two of which where Deputy Inspector Edward Mullane had asked plaintiff to downgrade crime reports as they concerned COMPSTAT issues and on one occasion where the CO had to address issues of police corruption concerning plaintiffs coming forward about a corrupt female police officer named Ciamora Dominguez in early 2004.

<u>Defendant's Statement #47</u>

In the repeatedly amended Charge of Discrimination Gomez filed with the United States Equal Employment Opportunity Commission in February-March 2004, no mention was made of Carmody – and Gomez complained that "other police officers in my precinct … have been disciplined for a high number of CCRB complaints, and have had CCRB complaints against them substantiated, but none of these officers have been taken off the street, as I have been." See Exhibit 35.

<u>Plaintiff's Response to Statement #47</u>

Plaintiff cannot either confirm or deny what Officer Gomez had written or addressed with the U.S. EEOC concerning his allegations. However, plaintiff does confirm that Officer Gomez did in fact mention his name as a witness to his said abuse verbally to investigators from the U.S. EEOC in 2004. Plaintiff also agrees with the CCRB allegations made whereupon other officers not only in the

043pct but citywide for that matter have many more CCRB complaints and are not reprimanded or terminated so such.


Dated:  Lake Success, New York
        September 11,2006

                                         By: _Susan P. Bernstein_
                                            Susan Penny Bernstein (SB6399)
                                            Attorneys for Plaintiff
                                             Jeffrey L. Goldberg, P.C.
                                            2001 Marcus Ave
                                             Lake Success, New York 11042
                                            (516) 775-9400


To:     Corporation Counsel
        City of New York
        100 Church Street
        New York, N.Y. 10007
        Lawrence Profeta