**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x
**WILLIAM J. CARMODY,**                              :
                                                     :
                                    **Plaintiff,**   :
                                                     :     **05 Civ. 8084 (HB)**
               **- against -**                       :
                                                     :     **OPINION & ORDER**
**THE CITY OF NEW YORK; RAYMOND W. KELLY,** :
**Police Commissioner; ; DARRYL WEIR, Sergeant,**    :
**Chief of Department; ARNOLD S. WECHSLER,**         :
**Director Employee Management Division; KEVIN**     :
**KENNEY, Sergeant, Employee Management Division;**  :
**FLORENCE L. FINKLE, Executive Director, Civilian** :
**Complaint Review Board; VANESSA J. ROSEN,**        :
**Investigator, Civilian Complaint Review Board; each** :
**defendant being sued in their individual and official** :
**capacity,**                                        :
                                                     :
                                 **Defendants.**     :
------------------------------------------------------------------------x

**Hon. HAROLD BAER, JR., District Judge:[1]**

On September 27, 2005, Plaintiff, William Carmody ("Plaintiff" or "Carmody"), filed an Amended Complaint that alleges that while he was a police officer with the New York City Police Department ("NYPD" or sometimes "Department"), the Defendants engaged in several incidents of harassment, retaliation, and conspiracy against him in violation of federal and state civil rights laws.[2]  Defendants moved to partially dismiss the Amended Complaint for failure to state a claim upon which relief can be granted, and the motion was granted in part.  Carmody v. City of New York, 2006 WL 1283125 (S.D.N.Y. May 11, 2006).  The Amended Complaint was dismissed in its entirety with regard to seven of the individually-named defendants, the NYPD, and the Civilian Complaint Review Board ("CCRB").  The conspiracy claims (Counts V, VI, VII, and VIII) were also dismissed against all Defendants.  Counts I, II, III, IV, IX, X, XI, XII, and XIII are left against the remaining defendants.

Defendants have now moved for summary judgment with regard to the remaining

---

[1] Keith Martorana, a Fall 2006 intern in my Chambers and a third-year law student at New York Law School, provided substantial assistance in the research for this Opinion.
[2] Plaintiff brings his claim pursuant to the following federal and state laws: 42 U.S.C. § 2003e-3, 42 U.S.C. § 1981, 42 U.S.C. § 1983, 42 U.S.C. § 1985, New York State Executive Law ("NYSEL") § 296, New York City Administrative Code ("NYCAC") § 8-502, and New York State common law.

retaliation and hostile work environment claims as well as the New York State common law claims of intentional infliction of emotional distress and intentional interference with employment contract.  For the reasons stated below, this motion is GRANTED.

## I.    BACKGROUND

The facts set forth below are undisputed, unless stated otherwise.  William Carmody was hired as probationary police officer by the NYPD on July 1, 2002 and attended the Police Academy until January 2003.  Declaration of Susan Bernstein in Opp'n to Def. Motion for Summary Judgment ("Bernstein Decl."), Ex. A, Affidavit of William Carmody ("Carmody Aff.") ¶ 2.  After graduation from the Police Academy, Carmody was assigned to the 43rd Precinct.  Id. Upon arrival at the 43rd Precinct, Plaintiff was assigned to the "Operation Impact" section where he met Police Officer Manual Gomez, a Hispanic Officer who was assigned to the 43rd Precinct at the same time as Plaintiff.  Id. ¶ 5-6.  The Plaintiff remained there until he was transferred to the 44th Precinct on March 22, 2004.  Declaration of Lawrence Profeta in Support of Motion for Summary Judgment ("Profeta Decl.") Ex. 4, Personnel Profile Report.  Approximately three months later, on July 19, 2004, Carmody was placed on modified duty.  Profeta Decl., Ex. 24.

*A. Activities at the 43rd and 44th Precinct*

In March 2003, while at the 43rd Precinct, Carmody befriended Gomez and offered to work with him since Gomez was often put on patrol alone.  Bernstein Decl., Ex. A, Carmody Aff. ¶ 7; See also Carmody Deposition ("Carmody Dep.") at 16:5-17.  Carmody alleges that he witnessed officers at the 43rd Precinct harass Gomez on a daily basis.  Bernstein Decl., Ex. A, Carmody Aff. ¶ 9, 11.

On February 3, 2004, Gomez filed a discrimination complaint with the NYPD Office of Equal Employment Opportunity ("EEO") that charged his commanding officer with creating a hostile, retaliatory, and discriminatory environment for him to work in and that much of this environment was as a result of another lawsuit that he, along with the Latino Officer's Association, instituted (and won) against the NYPD in October 2000.  Profeta Decl., Ex. 33. Several weeks later, Gomez also filed a complaint with the Equal Employment Opportunity Commission ("EEOC") that alleged retaliatory and discriminatory treatment on the basis of race. Profeta Decl., Ex. 35.

At both of these agencies, Carmody maintains that Gomez named him as a corroborating witness to the retaliatory and hostile work environment Gomez suffered at the NYPD.  Carmody

also states that he informed individuals at the 43rd Precinct that he would testify for Gomez in his EEO complaint against the NYPD.  Bernstein Decl., Ex. A, Carmody Aff. ¶ 13.

Plaintiff alleges in the matter before me – filed with the EEOC on December 14, 2004 and for which he received a right-to-sue letter on June 22, 2005 and then filed this action on September 27, 2005 – that from 2003 forward, he was retaliated against and harassed by certain members of the NYPD due to his close association with and support of Officer Gomez.  From March 2003 through March 2004, Carmody states that he was questioned about Gomez's off and on duty activities by Lieutenant Marlene Beaman ("Lieutenant Beaman").  Id. ¶ 19-20.  Further, and as part of his complaint, he opines that after he reported the misconduct of a fellow police officer to the Internal Affairs Bureau, the harassment increased.  Carmody Dep. at 128:12-17.  He goes on to say that civilian complaints were erroneously substantiated against him by the CCRB, suggesting that false statements were made or approved by the Executive Director.  Bernstein Decl., Ex. A, Carmody Aff. ¶¶ 25-36.  Last, Carmody claims that his locker was vandalized three times after he was transferred to the 44th Precinct, yet no action was taken although he reported the damage to his superiors.  Carmody Dep. at 84:5-92:20.

*B. Termination from the NYPD*

Carmody was the subject of investigations by the CCRB[3] into civilian complaints filed against him as well as investigations by the Internal Affairs Bureau ("IAB") for failure to comply with the NYPD residency requirement and the requirement to safeguard evidence.

*1. Civilian Complaints*

While assigned to the 43rd Precinct, civilians filed five complaints with the CCRB against Officer Carmody, two of which were substantiated.[4]

1. May 2003 – Mr. Orlando Clarke stated that Carmody threatened his life ("Clarke Complaint"). Profeta Decl. Ex. 6.

2. June 2003 – Ms. Patrice Coleman stated that Carmody threatened to punch her son, David Revill, and daughter, Patrice Revill, in the face ("Revill Complaint"). Profeta Decl. Ex. 7.

---

[3] The CCRB is an independent body that consists of 13 members of the public appointed by the mayor to investigate complaints of misconduct by NYPD officers.  Profeta Decl., Ex. 13, NYC Charter § 440.  The Board includes a civilian Executive Director, a member from each of the five boroughs, three members usually with law enforcement experience (but not affiliated with the NYPD), and five individuals selected by the mayor.  Investigators are all civilians, trained by the CCRB.

[4] It is interesting to note that over the last five years, 88% of complaints referred to CCRB were closed as unsubstantiated.  CCRB Status Report, Jan. – Dec. 2005, available at, http://www.nyc.gov/html/ccrb/pdf/ccrbann2005.pdf.

3.  October 2003 – Ms. Anita Eversley stated that Carmody issued her a summons that was racially motivated ("Eversley Complaint"). Profeta Decl. Ex. 8.

4.  October 2003 – Mr. James Carroll stated that Carmody and his partner, Officer Gomez, harassed him and Carmody issued him an improper summons ("Carroll Complaint").  Profeta Decl. Ex. 9.

5.  November 2003 – Mr. Mark Romero stated that Carmody used excessive force against him during a traffic stop and confiscated three Patrolman Benevolent Association cards that belonged to his brother-in-law ("Romero Complaint"). Profeta Decl. Ex. 10.

On October 5, 2003, the number of civilian complaints in Carmody's file triggered the standard alert issued by IAB in such circumstances:

> As of 10/03/2003, 3 incidents are linked to POM WILLIAM J CARMODY that have occurred since 10/03/2002.  3 or more incidents during a 12 month period indicates that the officer may need to be reviewed for a potential problem.

Profeta Decl., Ex. 11. Although Carmody denies that the underlying conduct alleged in the complaints ever happened, he claims that whatever they were, they were all retaliatory in nature – the Clarke Complaint and the Romero Complaint were referred for investigation.  IAB also investigated the Romero Complaint.

*a. Clarke Complaint*

The CCRB substantiated the following allegations against Officer Carmody.

> Abuse of Authority:  Officer William Carmody stopped the car in which Orlando Clarke was an occupant.

> Abuse of Authority:  Officer William Carmody threatened Orlando Clarke with the use of force.

> Abuse of Authority:  Officer William Carmody searched the car in which Orlando Clarke was an occupant.

Profeta Decl., Ex. 12.  The CCRB found that Carmody did not have reasonable suspicion to stop the car nor did he have probable cause to search it.  Id. at 2.  Further, since the CCRB found that Mr. Clarke, the complaining witness, was a credible witness, whereas the three officers on the scene offered "inconsistent and implausible statements," the use of force charge was also substantiated.  Id.  As a result of their finding, Florence Finkle, Executive Director of the CCRB,

recommended to the Police Commissioner in a memorandum dated February 2, 2004 that charges be brought against Officer Carmody.  Profeta Decl., Ex. 14.  On October 20, 2004, the NYPD Department Advocate's Office approved charges against Officer Carmody in connection with the substantiated allegations in the Clarke Complaint.  Profeta Decl., Ex. 15.  Of the complaints that follow, this is the only charge Carmody claims he was notified about.  Bernstein Decl., Carmody Aff. ¶¶ 45, 53.

   *b. Romero Complaint*

   As stated above, Mark Romero charged that Carmody used excessive force against him and confiscated three Patrolman Benevolent Association cards during a traffic stop.  The CCRB substantiated six allegations against Carmody.

      Abuse of Authority:  Officer William Carmody stopped the car in which Mark Romero was an occupant.

      Abuse of Authority:  Officer William Carmody issued a summons to Mark Romero.

      Abuse of Authority:  Officer William Carmody frisked and searched Mark Romero.

      Abuse of Authority:  Officer William Carmody detained Mark Romero.

      Abuse of Authority:  Officer William Carmody searched the car in which Mark Romero was an occupant.

      Discourtesy:  Officer William Carmody spoke rudely to Mark Romero.

Profeta Decl., Ex. 18.  The CCRB found that Carmody lacked reasonable suspicion to stop as well as search the vehicle.  Id. at 2.  In addition, the CCRB concluded that Carmody issued a disorderly conduct summons to Romero in bad faith, thus the subsequent search and detention of Romero was improper.  Id.  Finally, the discourtesy allegation was substantiated "because of PO Carmody's inconsistent and incredible statements."  Id.

   Further, in June 2004, the IAB substantiated the portion of Romero's complaint that charged that Carmody seized three PBA cards and failed to voucher those cards, per NYPD procedure.  Profeta Decl., Ex. 16.  That month, the IAB issued a Class A Command Discipline ("CD") to Carmody for this violation.  Profeta Decl., Ex. 17.  He does not dispute that he failed to voucher the cards, although emphasizes that he made a common administrative error and that the issuance of a CD for failure to voucher property was a rare step indeed – generally, it is

considered a minor violation in the Department.

*2. Bronx County ADA Complaint re: Mishandling of Evidence*

Charges were filed against Carmody after the Bronx County Assistant District Attorney John Goward ("ADA Goward") contacted IAB with respect to Carmody's handling of evidence in a public disturbance case. The pertinent facts are as follows. On September 20, 2003, Officers Carmody and Gomez arrested several individuals at the scene of a public disturbance. Profeta Decl., Ex. 19. Carmody provided eight pictures of the incident to ADA Goward, which he stated were developed from a camera given to Gomez by an anonymous citizen on the date of the incident. Id. However, one of the arrested individual's stated to ADA Goward that the camera was his and an unknown officer confiscated it. Id. This allegation spurred ADA Goward to contact IAB for assistance in locating a voucher for the camera and film, or in the alternative, the items themselves. Id.

In October 2004, an IAB investigation found that Carmody lost the camera, negatives, and certain arrest documents. As a result, the following charges were substantiated against him: "Failure to Prepare a Property Clerk Invoice" and "Failure to Safeguard Evidence." Id. Carmody does not dispute these findings and admits to losing the materials, but contends that neither his supervisor nor ADA Goward told him to voucher the evidence. In addition, the investigation report noted that Carmody violated NYPD procedure by his failure to document certain information in his activity log. Carmody denies this charge. For the above claims, Schedule A Command Disciplines were issued to Carmody. Profeta Decl., Ex. 20, Ex. 21. Carmody, however, states he never received any of these CD notices, thus was not aware that CCRB complaints had been substantiated against him. In support, he points out that he did not sign the back of the CD notice as required by Department procedure. His failure to sign the CD form is irrelevant to his notice claim since the resolution of any CCRB complaint (substantiated or unsubstantiated) is forwarded to the Police Advocate's Office as well as to the officer. Further, it stretches credulity to believe that Carmody, after being interviewed by the CCRB in connection with each of these complaints, would forget about them rather than to inquire how they were resolved.

On October 8, 2004, the NYPD Advocate's Office approved two charges against Carmody for failure to properly invoice the property received in connection with the September 2003 incident. Profeta Decl., Ex. 22. Plaintiff denies any knowledge of these charges. Bernstein

Decl., Carmody Aff. ¶ 44.

*3. Residency Investigation*

In November 2003, Cindy Burke, the mother of Carmody's former girlfriend, reported to IAB that Carmody resided at a home he owned at 207 9th Street in Hoboken, New Jersey, rather than at the Bronx residence listed on Carmody's employment record.[5]  Profeta Decl., Ex. 23.

IAB conducted an investigation whereby they placed Carmody under surveillance at both the Hoboken and Bronx addresses from approximately December 2003 through June 2004. Bernstein Decl., Ex. E, 7:12-14.  The result of this surveillance, in pertinent part, is as follows:

- Out of the 22 observations of the Hoboken home, Carmody was observed at the Hoboken location 13 times.

- Carmody was never observed entering or leaving the Bronx apartment.

- No one who lived and/or worked at the Bronx address recognized Carmody.

- With the exception of a doorman who stated that Carmody may have visited the Manhattan apartment, none of the individuals who lived or worked at the Manhattan address recognized Carmody.

- Officer Adam Kreitzberg, the only individual listed on the lease as the resident of the Bronx apartment, stated during his interview that Carmody paid him $200/month to stay on the couch in the apartment.  He stayed there approximately twice a month.

- During Carmody's interview, he reported that he spent 7-10 days a month at the Bronx apartment.  The balance of the month he spent at his sister's house in Hoboken or with various women whose names he could not recall, with the exception of a woman called "Wendy." (He spent one night with her and stated that she lives somewhere near the 13th precinct.).

- Carmody stated that he kept two duffle bags of clothing, shoes, and toiletries at the Bronx apartment, and the remainder of his things he kept at the Hoboken address.

Profeta Decl., Ex. 23.

As a result of the above, the investigating officer recommended that the residency fraud

---

[5] Prior to living in at 2965 East 196th Street, Apt. 3D, Bronx, New York, Carmody's employment record indicates that he resided at 108 East 96th Street, Apt. 16D, Manhattan.  Profeta Decl., Ex. 23.  He submitted a change of address form on July 3, 2003.  Id.

allegation be substantiated and added a charge of making a false and misleading statement.  Id.
On October 6, 2004, the NYPD Advocate's Office approved yet another charge against Carmody,
this one for failure to comply with NYPD residency requirements.  Profeta Decl., Ex. 28.  The
charge was amended on November 22, 2004 to add an allegation that Carmody "knowingly and
willfully made a materially false statement or misrepresentation [to an investigating police
officer] during an official department interview."  Profeta Decl., Ex. 29.  Carmody denies making
any false statements to the investigators and claims that he was never made aware of these
charges.

　　　Carmody maintains the he was and is a resident of New York City and that the NYPD
investigative report is not credible.  Bernstein Decl., Ex. A, Carmody Aff. ¶ 56.  In support of his
position, he submits the New York Unemployment Insurance Appeal Board decision that found
that he complied with NYPD residency requirements.  Bernstein Decl., Ex. D.  Further, Carmody
points out that the NYPD report fails to indicate the dates and times when he was observed at the
Hoboken house.  As a result, the report is misleading because it does not note that he was in New
Jersey only on scheduled vacation time or on a day off.  Id.  In addition, Carmody contends that
the witness accounts should not be credited because he worked a 6pm – 2am shift, making it
unlikely that any of these individuals would ever have seen him, not to mention recognize him.
Carmody Decl. 14:22-23.  Last, the house was not in livable condition since he was in the process
of renovation for rental purposes.  Id. ¶¶ 56-57.  While this charge is, in my view, less than
airtight, it was clearly initiated by a stranger to, and unconnected with any scheme by the NYPD
to retaliate for the Plaintiff's relationship with Gomez.

　　　On February 22, 2005, the NYPD terminated him for misconduct as well as residency
fraud.

## II.        STANDARD OF REVIEW

　　　Pursuant to Federal Rule of Civil Procedure 56, the movant on a motion for summary
judgment must establish that there is no genuine issue of material fact and the undisputed facts are
sufficient to warrant judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23
(1986); Anderson v. Liberty Lobby Inc., 477 U.S. 242, 250 (1986).  The party opposing summary
judgment "may not rest upon the mere allegations or denials of the adverse party's pleading, but  .
. . must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P.
56(e).  A disputed issue of material fact alone is insufficient to deny a motion for summary

judgment, the disputed issue must be "material to the outcome of the litigation," <u>Knight v. U.S.</u>
<u>Fire Ins. Co</u>., 804 F.2d 9, 11 (2d Cir. 1986), and must be backed by evidence that would allow "a
rational trier of fact to find for the non-moving party."  <u>Matsushita Elec. Indus. Co. v. Zenith</u>
<u>Radio Corp</u>., 475 U.S. 574, 587 (1986); <u>See</u> <u>also</u> <u>Bickerstaff v. Vassar College</u>, 196 F.3d 435, 452
(2d Cir. 1999) ("Statements that are devoid of any specifics, but replete with conclusions, are
insufficient to defeat a properly supported motion for summary judgment.").  In ruling on a
summary judgment motion, the Court resolves all ambiguities and draws all inferences against the
moving party.  <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962) (*per curiam*); <u>Donahue v.</u>
<u>Windsor Locks Bd. of Fire Comm'rs</u>, 834 F.2d 54, 57 (2d Cir. 1987).

It is well-known that in employment discrimination cases, where it is necessary to explore
an employer's intent and motivation, summary judgment may not be appropriate.  <u>See</u> <u>Patrick v.</u>
<u>LeFevre</u>, 745 F.2d 153, 159 (2d Cir. 1984).  Consequently, affidavits and deposition testimony
must be scrutinized for circumstantial evidence, which if believed, would support a finding of
discrimination.  <u>Gallo v. Prudential Residential Servs.</u>, 22 F.3d 1219, 1224 (2d Cir. 1994).
Plaintiff must still produce sufficient evidence in support of his claim, so that a rational juror
could find in his or her favor.  <u>See</u> <u>Meiri v. Dacon</u>, 759 F.2d 989, 998 (2d Cir. 1985) ("To allow a
party to defeat a motion for summary judgment by offering purely conclusory allegations of
discrimination, absent any concrete particulars, would necessitate a trial in all [discrimination]
cases.").

### III.   DISCUSSION

Plaintiff brings all claims against the City of New York as well as six individual
Defendants, in their individual and official capacities.  As a preliminary matter, let me deal with
the individual Defendants – Raymond W. Kelly, Darryl Weir, Arnold S. Wechsler, Kevin
Kenney, Florence Finkle, Vanessa Rosen – and their claim that they are protected by qualified
immunity.  An official may rely on a qualified immunity defense if the official's conduct did not
violate a clearly established constitutional right or it was objectively reasonable for the officer to
believe his actions did not violate the law.  <u>Anderson v. Creighton</u>, 483 U.S. 635, 641 (1987).  A
right is clearly established when "the contours of the right are sufficiently clear that a reasonable
official would understand that what he is doing violates that right.  The unlawfulness must be
apparent." <u>Connell v. Signoracci</u>, 153 F.3d 74, 79-80 (2d Cir. 1998) (quoting <u>Anderson v.</u>
<u>Creighton</u>, 483 US 635, 640 (1987)).  An action is objectively reasonable if "officers of

reasonable competence could disagree" on the validity of the officer's actions.  Malley v. Briggs, 475 U.S. 335, 341 (1986).

The retaliation and hostile work environment claims brought by the Plaintiff allege acts, which if true, clearly violate established law; thus, qualified immunity, a question of law in most instances, is not yet ripe for decision and as it turns out, need not be decided.

## A. Title VII Claims

This section will discuss the retaliation and hostile work environment claims Plaintiff brings pursuant to Title VII of the Civil Rights Act of 1964.  Before proceeding with the substantive allegations of Plaintiff's Title VII claims, I note that since "individuals are not subject to liability under Title VII," Wrighten v. Glowski, 232 F.3d 119, 120 (2d Cir. 2000) (per curium), citing Tomka v. Seiler Corp., 66 F.3d 1295, 1313 (2d Cir. 1995), the Title VII retaliation and hostile work environment claims are dismissed against all Defendants in their individual capacities.  The remainder of this section will deal with the Title VII claims with respect to the City of New York and the individual Defendants in their official capacities.

### 1. Retaliation Claim (Count I)

Title VII protects employees who oppose a discriminatory practice or file an employment discrimination claim of retaliation against an employer.  The statute provides, in even broader terms, that

> It shall be an unlawful employment practice for an employer to discriminate against any of its employees or applicants for employment, . . . because he has opposed any [discriminatory] practice or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 USC§ 2000e-3(a).  An employer violates Title VII if it allows a retaliatory motive, either in part or in toto, to lead to an adverse employment action toward an employee.  Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993).

To establish a Title VII violation, the plaintiff must first establish a prima facie case of retaliation.  To do so, the plaintiff must allege that 1) he engaged in a protected activity known to the defendant, 2) suffered an adverse employment action, and 3) there exists a causal connection between the protected activity and the adverse employment action.  Terry v. Ashcroft, 336 F.3d 128, 140-41 (2d Cir. 2003) (internal quotation omitted).  Should the Plaintiff meet the three-pronged test for a prima facie case, the McDonnell Douglas burden-shifting framework comes

into play, see Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996), and the burden
of going forward shifts to the employer to "articulate some legitimate, non-discriminatory reason
for the employer's rejection." McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  If
the employer is able to do so, then plaintiff must show that the stated reason is pretextual. Id.

*a. Prima Facie Case*

> *i. Protected Activity*

As stated above, Title VII provides that an employer cannot discriminate against an
employee "because he has made a charge, testified, assisted, or participated in any manner in an
investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).  Since the
statute is silent as to the rights of third parties who claim Title VII protection due to the
discrimination experienced by others, it is unclear whether Carmody can bring a Title VII
retaliation claim based on the alleged discrimination Gomez suffered while a NYPD officer.

> *a. Relationship-Based Claims*

Carmody argues that he is entitled to Title VII protection because of his relationship with
and support of Gomez.  Under this relationship-based theory of protected activity, individuals
who are punished solely due to their relationship to a complaining party should be permitted to
bring a Title VII retaliation claim.  The Second Circuit has not addressed this precise question,
See, e.g., Genao v. New York City Dep't of Parks & Rec., 2005 WL 1220899, at *5 (E.D.N.Y.
May 23, 2005), but at least my reading of the underlying policy goals of Title VII suggest that
protection extends to some "relationship-based" plaintiffs. Id. at *5-6.  In explanation, Judge
Gleeson stated in Genao that

> [T]here is a conflict between the plain language of the anti-retaliation
> provisions and the policies animating those provisions: there can be no
> doubt that an employer who retaliates against the friends and relatives
> of employees who initiate anti-discrimination proceedings will deter
> employees from exercising their protected rights.

Id. at *6.  This rationale appears to militate in favor of finding that Carmody's race vis-a-vis
Gomez qualifies as protected activity under Title VII.  The problem here is it's hard to tell from
the record whether Gomez ever sought the Plaintiff's help and whether it matters.

Carmody testified at his deposition that he befriended Gomez in March 2003 when they
were both assigned to the 43rd Precinct.  Carmody Dep. at 16:5-6.  Their friendship began when
Carmody witnessed his fellow police officers poor treatment of Gomez.  Carmody Dep. at 24:2-7.

Carmody testified that Gomez warned him that he would be targeted by NYPD officers as a result of their friendship.

> A:  Officer Gomez informed me that if I worked with him the police department would come after me, as was I [sic] informed by Lieutenant Marlene Behman that if I continued to associate or work with Officer Gomez that my employment with the New York City Police department would be placed at risk.
>
> Q:  When did Officer Gomez tell you that you would get into trouble if you worked with him?
>
> A:  The first night that I worked with him at some point in late March, early 2003.
>
> Q:  And what did you say to Officer Gomez at that time?
>
> A:  I asked him how did he know that.
>
> Q:  And what did he say?
>
> A:  He said because everyone that he befriends that's a police officer within the police department is retaliated against in some fashion and that would happen to me if I befriended him or worked with him.

Carmody Dep. 73:2-17.  According to Carmody, that retaliation came to pass, and culminated in his termination from the NYPD.

In those few cases where the court has extended Title VII protection to third parties, the individuals were either spouses or close relatives of the complaining worker.  In fact, the Western District of New York has held that status as a "close relative" is required in order to obtain protection under a relationship-based theory of protected activity.  See e.g. Murphy v. Cadillac Rubber & Plastics, 946 F. Supp. 1108, 1118 (W.D.N.Y. 1996).  In this case, Carmody befriended Gomez, thus, whether this relationship could satisfy the protected activity rung is not free from doubt.

> *b. Witness in Discrimination Complaint*

Carmody also argues that he was retaliated against because Gomez named him as a witness in his EEOC complaint and Carmody verbally expressed to individuals at the NYPD that he was willing to testify on Gomez's behalf.  Title VII provides, in part, that an employer cannot discriminate against any employee due to their "participat[ion] *in any manner* in an investigation, proceeding, or hearing under [Title VII]."  42 U.S.C. § 2000e-3 (emphasis added).  The Second

Circuit held that Title VII covers individuals who are named as a voluntary witness in a Title VII suit.  Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 168 (2nd Cir. 2005).  This protection applies, even if the person does not testify because the case settles prior to trial.  Id.

 This ground of protected activity may be more promising for Carmody, although, as the Defendant points out, Plaintiff only raised it at the 11th hour.  There was no mention, in either Carmody's Complaint or Amended Complaint, that Carmody was named as a witness in Gomez's discrimination complaint.  And at his deposition, he initially testified that the sole basis for the retaliatory activities against him was his friendship with Officer Gomez.

  Q:  Is that what you believe, you believe that you were retaliated against because you became friends with Officer Gomez?

  A:  Yes.

  Q:  And what do you base that on?

  A: Because I was fired and retaliated against by the New York City Police Department after I became friends with Officer Gomez.

  Q:  Is there any other reason you think you were retaliated against by the police department?

  A:  No.

Carmody Dep. 73:18-74:3.

 Soon thereafter, Corporation Counsel sought an explanation as to why Carmody was the only one of Gomez's friends that was retaliated against by the Department.  At this point, Carmody raises, for the first time, that he was a named witness in Gomez's discrimination complaint.

  Q:  What makes you think you were retaliated against by the police department because of your friendship with Officer Gomez?

  A:  Because I worked with him numerous times.  He was a friend of mine.  I was a witness in his EEO complaint.  I was a witness with what happened to him and in turn I got fired and retaliated against.

Carmody Dep. 74:21-75:2.

 Carmody goes on to provide more details as to this allegation.  He testified that in 2003 he agreed to serve as a witness on Gomez's behalf.  Id. at 150:19-151:7.  Consequently, he claims that Gomez attempted to list him as a witness when he filed his NYPD EEO complaint.

> Q:  And when did Officer Gomez list you as a witness?
>
> A:  He attempted to list me as a witness when he attempted to file the first complaint.
>
> . . .
> A:  The NYPD EEO office told him that he couldn't file a complaint, and refused to let him.
>
> Q:  How do you know this?
>
> A:  Because Officer Gomez was not permitted to file a complaint and he informed me of such.

Carmody Dep. 76:1-11.  On this score, Plaintiff submits nothing other than self-serving uncorroborated hearsay.  It seems mighty unlikely that the last answer above is true.

Further, Carmody also testified that he was contacted on two separate occasions by Gomez's attorney about his availability to be a witness in a lawsuit.  The first time occurred at the end of 2003, and he spoke to an attorney at Mintz & Gold whose name he could not recall.  He told the attorney at that time that he would testify on Gomez's behalf, if necessary, but they never got back to him.

> A:  Basically, on one occasion, when Officer Gomez had given me a phone number, he said there was one attorney that was handling some of the Latino officers case, and part of his discrimination complaint, he asked to call him.  I believe he is from the law firm of Mintz & Gold.  And I called them, they asked me on [a] telephone interview what type of harassment did I see against Officer Gomez.  I explained that his equipment was damaged, his locker was flipped; and I said if they need me to come and speak in person that I would do so, and they said that they would get back to me and they never did.
>
> . . .
>
> Q:  When did you have this conversation?
>
> A:  I believe it was late 2003.

Carmody Dep. at 102:22-103:6, 103:10-11.  The second occasion occurred in the latter half of 2004, and again, he states that he was never re-contacted after the initial phone call.  Id. at 105:1-6.

However, Defendants counter that contemporaneous documentation refutes Carmody's claim that he was a named witness in either Gomez's NYPD EEO discrimination complaint or his EEOC complaint.  In the first instance, when Gomez did file a discrimination complaint, he did not name Carmody as a witness.  In fact, the February 3, 2004 NYPD EEO complaint requested that the complainant provide the names of any witnesses to the discrimination.  Gomez only indicated "P.O. Guerra of the 43rd Pct."  Profeta Decl., Ex. 33.  The only reference to Carmody in the EEO complaint is as a Caucasian police officer that was treated more favorably than Gomez.

> Police Officer Gomez further stated that there are officers who have as many civilian complaints as he does who are white (Police Officers Collura, Eisman & Carmody) and are not assigned to administrative duties or "demeaning jobs," such as sweeping and cleaning bathrooms.

Id., Ex. 34.  And with regard to Gomez's EEOC complaint, filed several weeks later, Carmody was not mentioned at all in the original complaint and the two amendments that followed.  Id., Ex. 35.

Finally, and the question begs asking, where is Gomez?  There is no affidavit in the record that lends support to any of the Plaintiff's declarations, which, given their purported friendship, is strange indeed.  Plaintiff's evidentiary support here is slim to none, however, under Second Circuit law, if he was named as a witness in Gomez's Title VII suit that qualifies as protected activity under Title VII and for this motion, I will accept his testimony as impartial satisfaction of this prong of his *prima facie* case.

To satisfy the second part of this prong, Carmody must show that the Defendants were aware that he engaged in protected activity, e.g. was a named witness in Gomez's discrimination complaint.  Carmody stated that it was well-known throughout the precinct that he be listed as a witness in Gomez's discrimination complaint.

> A:  . . .  Again, I didn't make it a secret that what was happening to Officer Gomez was wrong and if he did call me as a witness, that I would testify.  I wasn't going to lie.

Carmody Dep. at 154:8-11.  He also affirms that that he "very clearly indicated to Lt. Beaman that I supported Officer Gomez in his claims."  Carmody Aff. ¶ 24.  However, Defendants suggest that Plaintiff's contention on this point is incredible since he is unable to recall or provide the name of any officers to corroborate his view.

> Q:  Did you tell anybody you were going to be a witness for Officer Gomez?

> A:  I am sure I did but I don't recall exactly who.
>
> Q:  But who would you have told?
>
> A:  Other officers that may have witnessed some other incidents.

Carmody Dep. at 152:1-6.

Carmody, however, in addition to his sworn affirmation, offers only an inadmissible hearsay statement in support of his claims.  Carmody testified that Gomez told him that he informed Detective Grier that Carmody would be a witness in his EEO complaint.  Bernstein Decl., Ex. A, Carmody Aff. ¶ 15.  With the exception of his testimony, Carmody does not submit any evidence, not even an affirmation from his friend, Gomez, which supports his contention.  Id. ¶ 24.  Carmody also claims that Gomez has an audiotape, which he has not heard, that captures the conversation between Gomez and Detective Grier.  Again, one must ask, "where's the meat?"[6]

Since all of the Plaintiff's allegations are unsupported, Defendants view appear significantly more plausible, but on this motion I will credit the Plaintiff's testimony and find that Plaintiff satisfies the first rung of his *prima facie* case.

### ii. Adverse Employment Action

Second, Carmody must show that he suffered an adverse employment action.  An adverse employment action is a materially adverse change in the terms and conditions of an individual's employment that may include: "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or another indices . . . unique to the particular situation."  See Richardson v. New York State Dep't of Correctional Serv., 180 F.2d 426, 446 (2d Cir. 1999).  Under this standard, it is clear that Plaintiff's termination from the NYPD on February 22, 2005 constituted an adverse employment action – tying it to some discriminatory animus is another story.

### iii. Causal Connection

Last, to set forth a *prima facie* case, Plaintiff must show that there is a causal connection between the protected activity and the adverse employment action.  Carmody claims that he was

---

[6] Given the parties inability to complete discovery and coordinate the submission of fully-briefed dispositive motions in conjunction with the pre-trial scheduling Order, I put off a decision on this motion, extended discovery and held an oral argument one month before trial.  Both parties represented that by doing this, all discovery could and would be completed and I would have the benefit of all their arguments.

disciplined (false complaints were substantiated against him, he was assigned to modified duty and then terminated) as a result of his support of and willingness to serve as a witness for Gomez in his discrimination complaints against the NYPD.

Plaintiffs can demonstrate a causal connection in three ways: "(1) direct proof of retaliatory animus directed against the Plaintiff, (2) disparate treatment of similarly situated employees, or (3) that the retaliatory action occurred close in time to the protected activities." McNair v. New York City Health and Hosps. Corp., 160 F.Supp.2d 610, 604 (S.D.N.Y. 2001).

Turning to the third way, and the only one that portends a possibility of success for the Plaintiff, the Second Circuit has stated that there is no "bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." Gorman-Bakos v. Cornell Coop. Extension, 252 F.3d 545, 554 (2d Cir. 2001). And courts have differed as to where they draw the line. Some courts have found that retaliatory actions that occur more than several months after the protected activity are at the outer limit of activities that can be used to demonstrate causation. See Ashok v. Barnhart, 289 F.Supp.2d 305, 314 (E.D.N.Y. 2003) ("[T]he interval between a protected activity and an adverse action that results in a finding of retaliation is generally no more than several months."); See also Carr v. WestLB Administration, Inc., 171 F.Supp.2d 302 (S.D.N.Y. 2001) (no causation when there was a four month lapse of time between retaliatory and protected activity). But a causal connection has been found when there has been an eight month gap between the protected activity and the retaliatory action. See, e.g., Grant v. Bethlehem Steel Corp., 622 F.2d 43, 45-46 (2d Cir. 1980).

Carmody reports that he was named as a witness in Gomez's discrimination complaint in late 2003, early 2004, placed on modified duty on July 19, 2004, and terminated in February 2005. Although slim time-wise, there is a possible causal connection between the protected activity and Plaintiff's placement on modified duty and perhaps his termination. Seven months passed before Carmody was given a modified assignment and one year passed before he was terminated. Once again, and in an abundance of caution, the Court finds that Plaintiff has sustained this aspect of his *prima facie* case.

*b. Pretext*

However, even assuming, *arguendo*, that the Plaintiff has established a *prima facie* case, which is not by any means beyond cavil, the case must be dismissed against the City of New

York as well as the individual Defendants in their official capacities because he has failed to show that his termination was pretextual.  This conclusion is further buttressed by the fact that as a probationary employee, Plaintiff could be fired for most any reason.  The Personnel Rules that govern city employees provide that probationary officers who provide unsatisfactory service may be terminated with notice, at the discretion of the agency head.

> At the end of the probationary term, the agency head may terminate the employment of any unsatisfactory probationer by notice to such probationer and to the commissioner of citywide administrative services.

DEPT. OF CITYWIDE ADMINISTRATIVE SERVICES, PERSONNEL RULES AND REGULATIONS OF THE CITY OF NEW YORK.  In addition, the New York Court of Appeals underscored the deference accorded to employers with regard to their probationary employees.

> [T]he probationary term is a trial period employed 'as a means of determining the merit and fitness of candidates.' . . . Thus we concluded that probationary terms 'serve to furnish the appointee with an opportunity to show his or her fitness and provide a more acceptable and less embarrassing means of terminating the employment of an unsatisfactory appointee.'

Prof'l, Clerical, Tech. Employees Ass'n v. Buffalo Bd. of Educ., 90 N.Y.2d 364, 375-76 (N.Y. 1997) (internal citation omitted).

Plaintiff disputes the Defendants contention that he was on probation at the time of this termination from the NYPD – he believes his probationary period had concluded.  The Defendants disagree.  However, both parties agree that police officers are subject to a two-year probationary period and that the two-year probationary period excludes time when the officer does not perform the full duties of the position.  As stated in the Personnel Rules and Regulations of the City of New York,

> Notwithstanding the provisions of paragraphs 5.2.1, 5.2.2 and 5.2.8(a), the probationary term is extended by the number of days when the probationer does not perform the duties of the position, for example:
>
> limited duty status, annual leave, sick leave, leave without pay, or use of compensatory time earned in a different job title; provided, however, that the agency head may terminate the employment of the probationer at any time during any such additional period.

Personnel Rules and Regulations, § 5.2.8, Extension of Probationary Period.  Although unstated

18

in the Personnel Rules, it is well-established that time spent on modified duty also extends the probationary period.  See Garcia v. Bratton, 90 N.Y.2d 991, 993-94 (1997) (finding that a police officer's time on modified duty extends the probationary period).

Carmody was hired as a probationary police officer on or about July 1, 2002 and placed on modified duty on July 19, 2004.  He was on modified duty when he was terminated by the NYPD on February 22, 2005.  Plaintiff's two-year probationary term ended on or around July 1, 2004.  However, as stated above, the Personnel Rules and Regulations of the City of New York provide that time out of work extends the probationary period.  In this instance, Carmody had amassed at least nine days of sick leave, Profeta Decl., Ex. 4, and 36 days of annual leave [this is the arithmetic of the Assistant Corporation Counsel, mine totals the annual leave at 43 days] by the time he was placed on modified duty on July 19, 2004.  Profeta Decl., Ex. 36.  As a result, Carmody was still on probation when he was placed on modified duty.  In fact, at his deposition, Carmody testified to this fact.

> A: I believe I was still on probation, yes.
>
> Q:  And you were put on modified duty?
>
> A: Yes.

Carmody Dep. at 250:9-11.

Notwithstanding the above, on this motion for summary judgment, Carmody states that he does not believe he was on probation when terminated on February 22, 2005.  In support, he states that he received an end of probation medical on December 17, 2003 but all documents with respect to his probationary status are in the possession of the Defendants.  Carmody Aff. ¶ 3.  Plaintiff provides nothing else in support of this claim, even though Defense counsel represents that Plaintiff's entire probationary monitoring file has been produced.  I have no reason to disbelieve Defense counsel's representation.[7]  Plaintiff's admissions, in conjunction with the evidence in front of me, reveal that Carmody was a probationary officer at the time of his termination.

On December 1, 2004, members of the Probationary Police Officer's Review Board voted unanimously to recommend the termination of Carmody.  Profeta Decl., Ex. 30.  The decision to terminate was based on the number of complaints against him as well as his failure to comply

---

[7] In a letter dated October 17, 2006, Plaintiff's counsel again requested Plaintiff's probationary monitoring file and all documents within it.  In response, in a letter dated October 26, 2006, Defendants' counsel represented to this Court and the Plaintiff that the probationary monitoring file has already been produced.

with the NYPD residency requirement.  In a memorandum from the Chief of Personnel, Rafael

Pinerio, to the First Deputy Commissioner, the recommendation to terminate Carmody was

explained as follows.

> It is recommended that Probationary Police Officer William Carmody
> be terminated.  For his short tenure as a New York City Police Officer,
> Probationary Police Officer Carmody has accumulated an exorbitant
> amount of complaints resulting in substantial disciplinary actions being
> taken against him.  In addition, Probationary Police Officer Carmody
> failed to maintain a residence in New York City or its surrounding
> counties as required by Department regulations.  Therefore, it is
> recommended that he be expeditiously separated from this Department.

Profeta Decl., Ex. 31, at ¶ 10.

Summary judgment is granted on the Title VII retaliation claim as to the City of New

York and the individually-named Defendants in their official capacities.

*2. Hostile Work Environment (Count II)*

The McDonnell Douglas burden-shifting framework also applies for Title VII hostile

work environment claims.  To state a claim for hostile work environment, the plaintiff must allege

that his work environment was abusive.  Harris v. Forklift, 510 U.S. 17, 22 (1973).  Specifically,

plaintiff must show that he is 1) a member of a protected class, 2) suffered unwelcome

harassment, 3) was harassed because of his membership in a protected class, and 4) the

harassment was sufficiently severe or pervasive to alter conditions of his employment and create

an abusive work environment.  Meritor Sav. Bank FSB v. Vinson, 477 U.S. 57, 65 (1986).  The

court looks at the totality of the circumstances to determine harassment – the frequency and

severity of the conduct, whether the conduct was physically threatening or humiliating, and

whether the behavior interferes with an employee's performance.  Harris, 510 U.S. at 23.  To

succeed, the Plaintiff must show that "either a single incident was extraordinarily severe, or that a

series of incidents were sufficiently continuous and concerted to have altered the conditions of

[his] working environment."  Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000)

(internal quotation marks omitted).  This standard is demanding, and requires proof that the

conduct was offensive, pervasive and continuous.  See, e.g., Kotcher v. Rosa & Sullivan

Appliance Ctr., 957 F.2d 59, 62-63 (2d Cir. 1992); Murphy v. Bd. of Educ. of the Rochester City.

Such. Dist., 273 F. Supp.2d 292, 312 (W.D.N.Y. 2003) (holding that "difficult or stressful

working conditions are not tantamount to a hostile work environment.").

*a. Incidents at the 43rd Precinct*

After Carmody began work with Gomez, he testified that the harassment began.  Although Plaintiff alleges that the harassment was pervasive, he only provides a handful of examples via deposition testimony.  Nothing else is provided to support his claims.  For example, he describes instances of harassment that involve Lieutenant Marlene Beaman.

> Q:  What exactly started happening to you when you started working with Officer Gomez?
>
> A:  I started getting written up by Lieutenant Beaman.  I was questioned by Lieutenant Beaman continuously.
>
> Q:  In what manner were you written up by Lieutenant Beaman?
>
> A:  Later on in the year 2003, possibly early 2004 she started putting me in a minor violations log.
>
> Q:  Anything else?
>
> A:  She issued me a CD claiming I failed to appear in traffic court when I was granted the day off by Lieutenant Downing, Sergeant Maleen, and I believe Sergeant Keia.

Carmody Dep. 201:7-18.  He claimed that the questioning became "almost daily practice," id. at 210:9-12, and lasted until he was transferred to the 44th Precinct.  Id. at 226:5-8.  Even accepting Plaintiff's allegations, questions related to one's job duties do not rise to the level of an abusive work environment.

*b.  Incidents at the 44th Precinct*

Carmody states that he was labeled a rat and the harassment continued after his transfer to the 44th Precinct in March 2004.

> Q:  You said that nobody would speak to you because they figured you were a rat?
>
> A:  That's correct.
>
>  . . .
>
> Q:  Who said that?
>
> A:  Several officers that were on the four to 12 command.
>
> Q: Who?

> A:  I don't know the names because I was just assigned to the command; I was not on friendly terms with anyone.  I started getting targeted immediately after arriving at the command, ongoing targeting from the 43rd precinct.
>
> Q:  Several officers said you were a rat?
>
> A:  Yes, and similar stories that were generated by Officer Gomez the year earlier were now generated about me, that I went to the academy several times, that I was a rat.

Carmody Dep. 93:12-94:2.  Carmody states that he noted these incidents in his memo book, which is not part of the record on this motion.

Last, he testified that his locker was vandalized on three occasions, late March/early April 2004, May 2004, and June 2004.

> Q:  What happened at the 44th Precinct with respect to your locker?
>
> A:  My locker was pried open.  My equipment was taken out and thrown on the floor.  My locker was plastered on one occasion, broken on another occasion.  My locker was flipped and I had some water and soda poured into the water.
>
> Q:  This all happened at one time or various occasions.
>
> A:  Approximately three different occasions.

Id. at 84:9-16.  The night before his locker was vandalized the first time, he stated that two officers (names unknown) asked him if he "ever got it deep," id. at 96:5-22, and he perceived this as a threat.  Id. at 97:19-20.  Carmody states that he reported the first incident to his superiors.  He did not report the following two locker incidents, but his failure to do so was not for fear of retaliation, but because he knew nothing would be done about it.  Id. at 100:23-25.

Albeit unlikely, the fact is that even if this activity is deemed enough to establish a hostile work environment, Plaintiff has failed to show that he is a member of a protected class and the harassment stemmed from his membership in this class.  Carmody is a white male who was purportedly harassed because he befriended Gomez.  This is not actionable under Title VII.  See, e.g., Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001) ("It is axiomatic that mistreatment at work, whether through subjection to a hostile work environment or through such concrete deprivations as being fired or being denied a promotion, is actionable ... only when it occurs

because of an employee's sex, or other protected characteristic.").  Accordingly, summary judgment is also granted as to this claim for the City of New York and the individual Defendants in their official capacities.

**B. Section 1981 Retaliation and Hostile Work Environment Claims (Counts III and IV)**

Plaintiff also brings retaliation and hostile work environment claims against all Defendants (the City of New York and the individual Defendants in their individual and official capacities) pursuant to the Civil Rights Act of 1866, 42 U.S.C. § 1981.  Section 1981 prohibits discrimination with respect to the conditions of a contractual relationship, which includes at-will employment.  See, e.g., Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 68-69 (2d Cir. 2000).  The section, which applies to probationary employees, provides, in pertinent part,

> All persons within the jurisdiction of the United States shall have the same right in every State or Territory to make and enforce contracts, . . . as is enjoyed by white citizens.

42 U.S.C. §1981(a); See also Patterson v. County of Oneida, 375 F.3d 206, 224-25 (2d Cir. 2004) (internal citation omitted).  As a preliminary matter, the factors that justified dismissal of Plaintiff's Title VII hostile work environment and retaliatory termination claims also apply here.  See id. at 225-26 (stating that in most ways, the same analysis applies for hostile work environment claims brought pursuant to section 1981 and Title VII);  Taitt v. Chemical Bank, 849 F.2d 775, 777 (2d Cir. 1988) (stating that the same elements are required to make out a retaliatory discharge claim pursuant to section 1981 and Title VII).  However, unlike Title VII, section 1981 claims can be brought against Defendants in their individual as well as official capacities.  See, e.g., Whidbee, 223 F.3d at 75.

*1. Individual Defendants in their Individual Capacities*

To establish individual liability under section 1981, the Plaintiff must demonstrate that the Defendant was personally involved in the complained of activity.  Id. at 75.  Personal involvement can be demonstrated by direct participation in the illegal activity, negligence in supervising subordinates who engaged in the wrongful behavior, and or failure to act when made aware unconstitutional acts were occurring.  See, e.g., Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).  As discussed above in Part III.A., Plaintiff failed to demonstrate that his termination from the NYPD was motivated by retaliatory animus, or even that the Defendants participated in any illegal activity.  Similarly, the record is utterly devoid of support that would raise an issue of material fact that suggests Defendants either participated in, or even knew about, the harassment

Plaintiff complains of.  Thus, the record does not, nor could it, support a section 1981 violation with respect to any of the Defendants in their individual capacities and summary judgment is granted.

*2.  City of New York and Individual Defendants in their Official Capacities*

To state a section 1981 claim against the City of New York and/or the Defendants in their official capacities, the Plaintiff must establish that the retaliatory activities were performed pursuant to an official policy or custom.  Jett v. Dallas Independent School Dist., 491 U.S. 701, 733-36 (1989).  In order to demonstrate an official policy or custom, the Plaintiff may show that 1) the discrimination "was so 'persistent or widespread' as to constitute a 'custom or usage with the force of law'" or 2) the discrimination conducted by subordinate employees was "'so manifest as to imply the constructive acquiescence of senior policy-making officials.'"  Patterson, 375 F.3d at 226 (internal citation omitted).  There is nothing in the record that suggests that the alleged retaliatory and harassing actions aimed at Carmody by the NYPD were widespread enough, if at all, to rise to the level of policy or custom.  In fact, the Plaintiff admits that to his knowledge, he was the only "friend" of Gomez who was retaliated against by the NYPD.

Q:  I think you also said Officer Kreitzberg is friends with Officer Gomez?

A: Correct.

Q:  Was Officer Kreitzberg retaliated against by the police department?

A:  Not to my knowledge.

Q:  You also testified that Officer Korn was friends with Officer Gomez?

A:  Correct.

Q:  Was Officer Korn retaliated against by the police department?

A:  Not to my knowledge.

Carmody Dep. at 74:9-20.  Under the section 1981 standard, Plaintiff still fails to raise an issue of genuine material fact as to survive summary judgment.  As a result, the motion is also granted as to the City of New York and all Defendants in their official capacities.

**C. State Law Claims**

*1. New York State Executive Law § 296 and New York City Administrative Code § 8-502
Retaliation and Hostile Work Environment Claims (Counts IX, X, XI, XII)*

Carmody brings retaliation and hostile work environment claims pursuant to New York

State Executive Law ("NYSEL") § 296 as well as retaliation and hostile work environment claims

pursuant to New York City Administrative Code ("NYCAC") § 8-502.  Both New York State

Executive Law and New York City Administrative Code retaliation and hostile work environment

causes of action are analyzed in the same manner as Title VII retaliation and hostile work

environment claims.  See, e.g., Weinstock v. Columbia University, 224 F.3d 33, 42 n.1 (2d Cir.

2000) (stating that "identical standards apply to employment discrimination claims brought under

Title VII, Title IX, New York Executive Law § 296, and the Administrative Code of New

York.").

Thus, in the first instance, since individuals are not liable under Title VII, the state law

retaliation and hostile work environment claims are also dismissed against all Defendants in their

individual capacities.  Further, since the same factors that support dismissal of Plaintiff's Title VII

retaliation and hostile work environment claims apply to the state claims too, summary judgment

is also granted with respect to the retaliation and hostile work environment state law claims

brought against the City of New York and the individual Defendants in their official capacities.

*2. Intentional Infliction of Emotional Distress Claim (Count XIII)*

Under New York State law, to state a claim for intentional infliction of emotional distress,

the Plaintiff must satisfy the following elements: "(i) extreme and outrageous conduct; (ii) intent

to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a

causal connection between the conduct and injury; and (iv) severe emotional distress."  Howell v.

New York Post Co., 81 N.Y.2d 115, 122 (N.Y. 1993) (internal citation omitted).  In other words,

the Plaintiff must demonstrate that "the conduct has been so outrageous in character, and so

extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as

atrocious, and utterly intolerable in a civilized community."  Id.  This is a strict standard, and hard

to satisfy.  Id.

Based on the record before me, Plaintiff has not demonstrated that the harassing incidents

he allegedly was subjected to rise to the requisite level of outrageousness to sustain a claim here.

Further, and more importantly, for the reasons discussed in Part III.B with respect to the section

1981 claim, Plaintiff has failed to connect any Defendant with the harassing conduct he alleges he was subjected to at the NYPD. Thus, the motion is granted here as well as to the City of New York and the individual Defendants in their official and individual capacities.

*3. Intentional Interference with an Employment Contract (Count XIII)*

Under New York law, to state a claim for intentional interference with an employment contact, the Plaintiff must show 1) the existence of a valid contract, 2) third party knowledge of that contract, 3) the third party intentionally caused the breach of the contract, and 4) the breach caused damage to the plaintiff. Finley v. Giacobbe, 79 F.3d 1285, 1294 (internal citation omitted). Plaintiff alleges that the NYPD is the third party that intentionally interfered with Plaintiff's contractual relationship when they terminated his employment based on charges they knew were false.[8]

In the first place, since the Plaintiff does not make any allegations on this score with regard to the individually-named Defendants, the motion is granted as to those Defendants, in both their individual and official capacities. With respect to the NYPD (City of New York), as discussed above, Plaintiff failed to articulate a triable issue of fact with regard to his probationary status or that he had fulfilled that requirement, therefore, he could be terminated if his performance was not deemed satisfactory. Plaintiff has not raised an issue of material fact that demonstrates that he was terminated in violation of law. Since the Plaintiff has failed to do this, summary judgment is also granted as to the City of New York.

## IV.   CONCLUSION

For the reasons stated above, the motion is granted as to all Defendants with respect to all claims. The Clerk of the Court is instructed to close this motion and remove it from my docket.

**IT IS SO ORDERED.**

**New York, New York**
**November 17, 2006**

_____
U.S.D.J.

---

[8] The NYPD was dismissed from this action in my May 11, 2006 Opinion and Order on the basis that the NYPD was not a suable entity. Pursuant to the New York City Charter, all claims should be brought against the City of New York. As a result, I presume that Plaintiff refers to the City of New York as the third party to the contract under this cause of action.

26